Ann B. LOVELL, et al.

v.

The ONE BANCORP, et al.

Supreme Judicial Court of Maine.

Argued March 19, 1992.
Decided Aug. 20, 1992.

See also 776 F.Supp. 578.

Richard E. Poulos (orally), John S. Campbell, Poulos, Campbell & Zendzian, P.A., Portland, for plaintiffs.

Robert S. Frank (orally), Roger Putnam, Verrill & Dana, Portland for One Bancorp.

Thomas D. Warren (orally), Deputy Atty. Gen., Augusta, for Superintendent of Banking.

Gerald F. Petruccelli, Petruccelli & Martin, Portland, James D. St. Clair, P.C., John F. Batter, III, J. Kent Wicker, Hale and Dorr, Boston, Mass., for defendants.

Mark L. Haley, James E. Kaplan, Diana M. Quinlan, Conley, Haley, O'Neil & Kaplan, Bath, Richard J. Wertheimer, David F. Freeman, Jr., Arnold & Porter, Washington, D.C., for amicus curiae.

Before WATHEN, C.J., and ROBERTS, GLASSMAN, CLIFFORD and COLLINS, JJ.

CLIFFORD, Justice.

Pursuant to 4 M.R.S.A. § 57 (1989) and M.R.Civ.P. 76B,[1] the United States District Court for the District of Maine has certified to this court five questions of state law. Because there is no dispute as to the material facts in this federal case and our answers to the questions will, in at least one alternative, be determinative of it, the requirements of our acceptance of the questions have been met and our exercise of jurisdiction is proper. *See Hiram Ricker & Sons v. Students Int'l Meditation Soc'y*, 342 A.2d 262, 264 (Me.1975); *White v. Edgar*, 320 A.2d 668, 674 (Me.1974); *In re Richards*, 223 A.2d 827, 828–833 (Me. 1966); *see generally* 2 Field, McKusick & Wroth, *Maine Civil Practice* § 76B.1–2 (2d ed. 1970 & Supp.1981). To the extent that we are required to do so, we answer question one in the affirmative. We need not, for reasons stated herein, make any pronouncement on question two. We answer question three in the negative and, because we do so, we do not address the remaining questions.

## BACKGROUND

The United States District Court (*Carter, C.J.*) has prepared a statement of facts, *see* M.R.Civ.P. 76B(b), from the material and undisputed facts presented by the parties in connection with their pending motions for summary judgment in that court. The following summary is based on that statement of facts. On October 2, 1987, the plaintiffs, Ann Lovell, individually and as personal representative of her late husband, John M. Lovell, Sr., and Mary Campbell filed an action in the United States District Court for the District of Maine challenging the lawfulness of Maine Savings Bank's 1984 conversion from a mutual association to a stock corporation.[2] The plaintiffs, depositors in Maine Savings Bank prior to and at the time of the conversion, claim that the conversion, the process by which it was approved, and the statutes and regulations that authorized it violated numerous state and federal constitutional rights. The plaintiffs' claims arise chiefly from their assertion that as depositors in a preconversion mutual association,[3] they owned a portion of the association proportionate to their funds on deposit and, thus, had certain protected property interests that were required to be recognized in the form of an asset or free stock distribution upon the bank's conversion from a mutual association to a stock bank.

### A. General Statutory and Regulatory Scheme Governing Mutual-to-Stock Bank Conversions in Maine

The conversion of mutual savings banks to stock form was first authorized in 1975 when the legislature enacted 9–B M.R.S.A. § 344 as part of a complete revision of the law governing Maine's financial institutions, sometimes referred to as the Maine Banking Code. P.L.1975, ch. 500. Section 344 provides that the procedure for the conversion of a mutual savings bank begins with the adoption of a plan of conversion by the bank's board of directors. 9–B

1. 4 M.R.S.A. § 57 provides in pertinent part:
   When it shall appear to the Supreme Court of the United States, or to any court of appeals or district court of the United States, that there are involved in any proceeding before it one or more questions of law of this State, which may be determinative of the cause, and there are no clear controlling precedents in the decisions of the Supreme Judicial Court, such federal court may certify any such questions of law of this State to the Supreme Judicial Court for instructions concerning such questions of state law, which certificate the Supreme Judicial Court sitting as a law court may, by written opinion, answer.
   M.R.Civ.P. 76B establishes procedure in certification situations.

2. The defendants in the federal case, designated as appellants before this court, are The One Bancorp, Federal Deposit Insurance Corporation (as receiver for Maine Savings Bank), the estate of Robert R. Masterton (the bank's late chief executive officer), Frederick W. Pape, Jr. (the bank's chairman of the board), and the Superintendent of the Bureau of Banking.

3. Maine Savings Bank was originally incorporated as the Portland Five Cent Savings Institution by chapter 328 of the Private and Special Laws of 1859. Prior to its conversion to stock form in June 1984, Maine Savings Bank operated as a mutual financial institution within the meaning of the Maine Banking Code. *See* 9–B M.R.S.A. §§ 131(27), 321–324 (1980).

M.R.S.A. § 344(1) (1980 & Supp.1991). The plan of conversion must then be forwarded to the Superintendent of the Bureau of Banking who must approve the plan after notice to depositors and the public of the proposed conversion, and an opportunity for comment. 9–B M.R.S.A. §§ 252, 344(2).[4] If, after considering the bank's conversion plan and any written comments or other evidence presented, the Superintendent finds the proposed conversion equitable to the depositors and to the bank, and that the relevant statutory criteria have been fulfilled, the Superintendent must issue a preliminary order of approval. The plan of conversion must then be submitted to the eligible account holders of the converting institution for their approval. 9–B M.R.S.A. § 344(3). Such approval requires a two-thirds vote of the eligible account holders.[5] If the account holders approve the plan of conversion, the bank then submits an executed plan to the Superintendent. 9–B M.R.S.A. §§ 343(4)(A), 344(4). If the Superintendent is satisfied that the conversion plan is equitable and complies with all applicable state and federal laws, the Superintendent must then issue a certificate of conversion that serves as "conclusive evidence of the conversion, and of the correctness of all proceedings relating thereto, in all courts and places." 9–B M.R.S.A. § 343(4)(B); *see* section 344(4).

Parties aggrieved by the Superintendent's final approval of the conversion may request judicial review in the Superior Court by filing, within forty days, a petition for review. *See* 9–B M.R.S.A. § 256 (1980); 5 M.R.S.A. §§ 11001–11002 (1989); M.R.Civ.P. 80C.

In August 1983 (four months before Maine Savings Bank adopted its plan of conversion), the Superintendent issued Bureau of Banking Bulletin No. 41, regarding mutual to stock conversions. That bulletin provided that the procedures and criteria contained in the Federal Home Loan Bank Board (FHLBB) regulations governing mutual to stock conversions for federally-chartered institutions [6] would be used as guidelines for the contents of a plan of conversion in connection with a mutual to stock conversion of a Maine state-chartered institution.[7] The FHLBB regulations authorize the converting institution to issue stock and require that the conversion plan give depositors in the converting mutual bank nontransferable subscription rights to purchase stock in the new institution before any offering is made to the public, but at the same *pro forma* price per share. 12 C.F.R. § 563b.3(c)(1) (1983). The federal regulations also require that depositors' accounts in the new bank equal their accounts in the converted bank, 12 C.F.R. § 563b.3(c)(12), and that the depositors' in-

---

**4.** The procedural and substantive criteria for the Superintendent's decision on a conversion application are governed by 9–B M.R.S.A. §§ 252, 253 and 344. Among other things, the Superintendent must insure that the depositors' interests are equitably provided for and that no other financial institution is adversely affected. *See infra* Section III.

**5.** The converting bank must submit the plan, as approved by the Superintendent, to the eligible account holders for their approval at an annual meeting or a special meeting called for that purpose. 9–B M.R.S.A. § 344(3); *see* 9–B M.R.S.A. § 353(3) (governing notice procedures for such a meeting). 9–B M.R.S.A. § 353(3)(B) provided at the time of the depositors' meeting in the instant matter:

A ⅔ vote of the corporators or members of each participating institution shall be necessary to approve the plan of [conversion] presented by its board of directors. Any corporator or member not present at such meeting in person shall be regarded as having affirma-

tively voted for the [conversion] and shall be counted among the ⅔ vote; provided that notice of this fact shall have been contained in the published and mailed notices; and provided further that such notice was mailed to the corporator or member [at least 15 days prior to the meeting].

The provisions for account holder voting by mail or by proxy that were in place before July 13, 1982 and after September 19, 1985, were not operative at the time of the Maine Savings Bank conversion. *See* P.L.1975, ch. 500; P.L.1981, ch. 553, § 1; P.L.1985, ch. 251.

**6.** *See* 12 C.F.R. § 563b (1983); 39 Fed.Reg. 9142–66 (Mar. 7, 1974).

**7.** Bulletin 41 did not purport to be a judicially enforceable rule or regulation within the meaning of the Administrative Procedure Act, 5 M.R.S.A. §§ 8002(9)(A), 8052–8057 (1989 & Supp.1991), and the Bureau has never officially adopted rules governing the contents of a plan of conversion.

terest in the converted bank's net worth be protected by the creation of a liquidation account. 12 C.F.R. § 563b.3(c)(13). Depositors have an inchoate interest in the liquidation account equal to their deposits at the converted bank that vests only if the new stock institution completely liquidates after converting. 12 C.F.R. § 563b.3(f). The FHLBB regulations prohibit a plan providing for the distribution of the converting institution's surplus to existing account holders in the form of cash or free stock. 12 C.F.R. § 563b.3(a)(2).

### B. The Maine Savings Bank Conversion

On December 30, 1983, Maine Savings Bank filed an application with the Maine Bureau of Banking to convert to stock form under 9–B M.R.S.A. § 344. The plan provided that Maine Savings Bank would convert to stock form and issue all of its stock to The One Bancorp, a holding company formed for the purpose of acquiring and holding the newly issued stock of Maine Savings Bank. All of the stock of The One Bancorp would be offered for sale first to eligible account holders [8] in a subscription offering at a price equal to the fair market value of the stock, based upon an independent appraisal. Shares not subscribed for by eligible account holders would be offered, at that same price and in descending order of priority, to other account holders, bank personnel, and the public, at the same fair market value. The plan did not provide for the distribution of any cash, or any free or discounted stock, to account holders of the Bank.[9] In connection with the transfer of Maine Savings Bank stock to The One Bancorp, the plan also provided that The One Bancorp would allocate to Maine Savings Bank a portion of the conversion proceeds from the sale of stock of The One Bancorp sufficient to maintain the Bank's existing capital-to-asset ratio.

The plan provided for the creation of a liquidation account, setting forth the priori-

ties for the distribution of any net surplus of Maine Savings Bank in the event that Maine Savings Bank liquidated while solvent within ten years following the conversion. The liquidation account was not a separate pool of funds, but an accounting memo entry of a contingent liability against the Bank. Each eligible account holder's interest in the liquidation account (the account holder's sub-account balance) would decline as withdrawals were made from his or her deposit account. The liquidation account would terminate in any event ten years after the conversion. The plan also imposed restrictions on the dividends that could be paid by Maine Savings Bank to The One Bancorp. Dividends were limited for three years following the conversion to 50% of Maine Savings Bank's earnings, and further limited so as to prohibit dividends that would reduce the stated net worth of Maine Savings Bank to an amount below the balance of the liquidation account. The substantive terms of Maine Savings Bank's plan were essentially the same as those required by the FHLBB regulations governing the mutual-to-stock conversion of FHLBB-regulated savings and loan associations and federally chartered mutual savings banks, see 12 C.F.R. § 563b, with the exception that the liquidation account established by Maine Savings Bank's plan of conversion was limited to a term of ten years.

No written comments or requests for hearing on the application were ever received by the Bureau of Banking, and no hearing on the application was held. On April 2, 1984, the Bureau of Banking issued an order conditionally approving Maine Saving's plan of conversion pursuant to 9–B M.R.S.A. § 344. On April 19 and 21, 1984, Maine Savings Bank mailed to each account holder a notice of a special meeting of account holders to take place on May 11, 1984, when account holders could vote for or against the plan of conversion. The mailing included both a summary description of and the full plan of conversion,

---

**8.** Eligible account holders were account holders in the Maine Savings Bank as of August 31, 1983, with aggregate balances in excess of $50.

**9.** There were limits set on the account of The One Bancorp stock that could be purchased by one person (5%), and by Maine Savings Bank officers and trustees (25%).

and stated, in accordance with 9-B M.R.S.A. § 344(3), *as amended by* P.L. 1981, ch. 553, that unless the account holder personally appeared at the meeting to vote "no," he or she would be deemed to have voted "yes" in favor of the plan. The notice also stated that the plan of conversion had been approved by the Bureau of Banking, and that any petition for judicial review of the Bureau's approval of the plan needed to be filed in the Superior Court no later than forty days after the decision was rendered. The mailing also included a prospectus offering subscriptions for shares of The One Bancorp, and a brochure describing the essential terms of the plan.

The subscription offering period extended from April 17, 1984 to May 17, 1984. During that time, 627,295 of the 3.6 million shares to be offered by The One Bancorp were subscribed, approximately 17.4% of the offering. About 2500 account holders of the Maine Savings Bank subscribed for shares in The One Bancorp. Plaintiffs Lovell and Campbell did not subscribe for any shares. The trustees and executive officers of the Maine Savings Bank collectively subscribed for 90,208 of the 3.6 million shares offered, approximately 2.5% of the total offering.

On May 11, 1984, Maine Savings Bank held the special meeting of account holders to vote on the plan of conversion. At the special meeting, 26 account holders in attendance voted for the plan of conversion, 9 of the account holders in attendance voted against the plan of conversion, and 2 of the account holders abstained from voting. The 88,867 account holders who were not present at the special meeting in person, including plaintiffs Lovell and Campbell, were deemed to have affirmatively voted for the plan of conversion. Thereafter, Maine Savings Bank certified to the Superintendent that the account holders had approved the plan of conversion by a majority vote, and on June 7, 1984, the Superinten-

dent issued a Certificate of Conversion pursuant to 9-B M.R.S.A. §§ 343(4)(B), 344(4), reciting that Maine Savings Bank had been legally converted from mutual to stock form effective upon receipt of proceeds from the sale of its stock, and that the conversion was in compliance with Maine and federal law.

On June 12, 1984, following notification of the receipt of proceeds from the sale of the remaining shares of stock in a public offering by The One Bancorp,[10] the Superintendent issued a certificate confirming the sale and the legal conversion of Maine Savings Bank. No petition for judicial review of the Bureau of Banking's actions, order, and certificates described above has ever been filed under the provisions of the Administrative Procedure Act. 9-B M.R.S.A. § 256; 5 M.R.S.A. §§ 11001—11008 (1989); M.R.Civ.P. 80C.

## THE QUESTIONS

In their motion for summary judgment in the United States District Court, plaintiffs contend that under Maine law, the account holders of Maine Savings Bank had a right to the distribution of the accumulated surplus of Maine Savings Bank that vested upon its conversion to stock form. On the basis of such a right, plaintiffs assert that the Bureau of Banking's approval of the plan of conversion, a plan that did not provide for a distribution of accumulated surplus to account holders, effected a taking or deprivation of their, and other account holders', property without due process or just compensation, in violation of their constitutional rights. Plaintiffs' assertion of what they call their ownership interest in the bank also underlies the state law claims for breach of fiduciary duty, fraudulent and negligent misrepresentation, conversion, unjust enrichment, breach of contract, and violation of 9-B M.R.S.A. § 344, the conversion statute.[11]

---

10. The One Bancorp realized, after expenses, over $43 million from the subscription and public offerings. In accordance with the plan of conversion, The One Bancorp transferred $5.837 million to Maine Savings Bank as additional capital.

11. In their complaint filed in United States District Court, plaintiffs seek an order nullifying the conversion, or in the alternative, a judgment awarding compensatory damages of $150 million and punitive damages of $50 million. At oral argument before this court, counsel for

Defendants have moved for summary judgment in federal court on plaintiffs' claim that the presumptive voting statute set forth in 9–B M.R.S.A. § 344(3) (as it then existed) denied plaintiffs their right to vote on the plan of conversion in derogation of their federal constitutional rights. Defendants also contend, by way of affirmative defense, that the certificate of conversion issued by the Superintendent, and the expiration of the time limit for judicial review under 5 M.R.S.A. § 11002, separately or in combination, bar plaintiffs' claims for relief based on state procedural law.

Finding no case law from this court that would control the outcome of the state law questions in this federal matter, and finding our answers to these questions necessary to the adjudication of the matter before it, the United States District Court for the District of Maine has by certification propounded the following questions of Maine law:

1. Does (1) the Certificate of Conversion issued by the Maine Superintendent of Banking on June 7, 1984, or (2) the time limits for obtaining judicial review of final agency action under the Maine Administrative Procedure Act, 5 M.R.S.A. § 11002, or (3) both in combination, bar Plaintiffs' claims for relief asserted under Maine common law and under the Maine Administrative Procedure Act, the Maine Banking Code (9–B M.R.S.A. § 343, 344) and the Maine Corporation Code (13–A M.R.S.A. § 608(1)(a))?

2. Does Maine law grant to depositors in a mutual savings association a right to vote by mail or proxy on the association's conversion to stock ownership?

3. Under Maine law, do depositors of a mutual savings bank have the enforceable right to a distribution of the surplus of any bank when it converts to stock form pursuant to 9–B M.R.S.A.

§ 344, in the absence of a charter provision providing any more than that set forth in Chapter 328, P. & S.L. of 1859 (the charter of Maine Savings Bank's predecessor the Portland Five Cent Savings Institution)?

In the event that the answer to Question 1 is "No" and the answer to Question 2 or 3 is "Yes," the Court respectfully requests that the Law Court answer two further questions of state law:

4. Does Maine law governing mutual-to-stock conversion require the Superintendent of Banking to promulgate conversion regulations?

5. If so, must those regulations be adopted according to Maine's Administrative Procedure Act?

## RESPONSE TO CERTIFIED QUESTIONS

### I.

Because the plaintiffs no longer seek to nullify the Maine Savings Bank conversion, with its concomitant administrative procedures and regulatory approvals,[12] we need not address question one insofar as it requests instruction on the cognizability and viability of plaintiffs' statutory claims under the Maine Banking Code, the Maine Administrative Procedure Act, and Maine Business Corporation Act. Any pronouncement we make regarding plaintiffs' statutory claims would be purely advisory and not within our authority to render. *See In re Richards*, 223 A.2d 827, 829 (Me.1966).

Plaintiffs' complaint, however, also asserts common law causes of action for breach of fiduciary duty, intentional and negligent misrepresentation, tortious conversion, unjust enrichment, and breach of contract. The District Court seeks instruction as to whether these common law claims are barred by the Superintendent's issuance of the certificate of conversion or

plaintiffs stated that they were no longer seeking nullification of the conversion. Plaintiffs, however, still claim damages for the deprivation of what they assert are their property interests in the surplus of the converting institution.

12. The Maine Savings Bank conversion, approved over eight years ago, involved the transfer of millions of dollars and the complete recapitalization of a financial institution. Maine Savings Bank has since failed and, in February 1991, the Federal Deposit Insurance Corporation became receiver.

by the plaintiffs' failure to obtain judicial review of the Superintendent's final action within the time limits imposed by the Administrative Procedure Act. *See* 5 M.R.S.A. § 11002. Although plaintiffs' common law claims are premised on their assertion that depositors in a mutual savings bank have a recognizable property interest in the mutual's net worth, *see Lovell v. One Bancorp*, 690 F.Supp. 1090, 1103 n. 24 (D.Me.1988), an interest we determine to be a mere contingency and not subject to vesting on conversion, *see infra* Section III, we nonetheless address this portion of question one.

■ We instruct the District Court that the statutory and administrative scheme governing the conversion of a mutual savings bank to stock form has effectively displaced private rights of action relating to the conversion process. The issuance of the certificate of conversion and the failure to seek judicial review under the Administrative Procedure Act, therefore, serve to bar plaintiffs' common law claims for relief.

A review of plaintiffs' common law claims makes quite clear that their attack is directed to the contents of the plan of conversion, the materials distributed to account holders regarding the conversion, and the particular method of conversion employed. The plaintiffs' common law claims are really a challenge to the Superintendent's approval of the conversion and the entire underlying conversion procedure. The statutory scheme contemplates that the Superintendent, exercising specified responsibilities, must find and insure that the interests of the depositors are equitably provided for in the plan, that the conversion will not adversely affect the stability of other institutions, and that all statutory and regulatory requirements governing conversions have been met. *See* 9–B M.R.S.A. §§ 252, 253, 344. The Superintendent's approval of the conversion and

issuance of a certificate of conversion is "conclusive evidence ... of the correctness of all proceedings" relating to the conversion. 9–B M.R.S.A. § 343(4)(B). Judicial review of the Superintendent's decision "shall be in accordance with the Maine Administrative Procedure Act." 9–B M.R.S.A. § 256; *see* 5 M.R.S.A. §§ 11001–11008.[13] It seems clear that the legislature intended section 256 to be the exclusive avenue for relief from the Superintendent's order of approval. It would certainly be anomalous to give the certificate of conversion conclusive effect absent judicial review of the Superintendent's action taken in accordance with the APA, but then to allow common law causes of action attacking the contents of the plan of conversion and the conversion process in general.

Federal courts have consistently held that the administrative scheme governing conversions of federally-chartered institutions displaces private rights of action. These courts have refused to entertain damage claims collaterally challenging the terms of a conversion plan approved by banking regulators. *Craft v. Florida Fed. Sav. & Loan Ass'n*, 786 F.2d 1546, 1552 (11th Cir.1986); *Harr v. Prudential Fed. Sav. & Loan Ass'n.*, 557 F.2d 751, 753 (10th Cir.1977) *cert. denied* 434 U.S. 1033, 98 S.Ct. 766, 54 L.Ed.2d 780 (1978); *see also Federal Home Loan Bank Bd. v. Elliott*, 386 F.2d 42, 53 (9th Cir.1967). In *Harr*, the Tenth Circuit Court of Appeals affirmed the dismissal of a complaint that challenged a mutual-to-stock conversion plan as a wrongful taking of depositors' interest and also attacked the proxy solicitation material utilized in the conversion. That court stated:

> [N]o matter how otherwise described, [plaintiffs' action] must in the first instance be a challenge to the approval by the Bank Board of the plan of conversion.... It is "The Plan" itself which is the real basis for the arguments ad-

**13.** In *McGary v. Barrows*, 156 Me. 250, 264, 163 A.2d 747 (1960), this court rejected a constitutional challenge against a "conclusive evidence" provision similar to the one at issue here. We stated:

The practice of giving to a certificate of organization the force of conclusive evidence of the fact certified is not new. Since at least 1876 Legislatures have repeatedly made use of this technique where it would appear the public interest is advanced by certainty.

vanced here by plaintiffs.... It is based on the consequences or impact of the plan on plaintiffs.

....

The complaint is directed to matters which are part and parcel of the plan of conversion approved by the Board. The plan itself is complained of as being unfair and "arbitrarily" having converted plaintiffs' interest in the mutual association to a stock ownership.... This can be nothing more than an assertion that the plan is wrong and should not have gone into effect.... As the matter now stands, the approval of the Board must somehow be first set aside before the plaintiffs can proceed as they argue here....

It does not make much difference whether this is called an exhaustion of administrative remedies, or whether it is viewed as what in reality is a challenge to the Bank Board's decision.... The subject matter, the nature of plaintiffs' claim, and the arguments before this court demonstrate that the relief sought can only be afforded by a challenge to the Bank Board's action as the basic decision and authorization for the acts and consequences complained of. Anything else would be directed to derivative and secondary matters, and would, for all practical purposes, be a collateral attack on the decision. The statutory provisions are directed to this end and we hold that the remedy created is exclusive under these circumstances.

*Harr,* 557 F.2d at 753–54. State courts, too, have dismissed similar complaints collaterally attacking a banking board's order of approval of a conversion. *See, e.g., In re New York Sav. Bank Depositors Litig.,* 145 Misc.2d 620, 547 N.Y.S.2d 497, 500 (Sup.Ct.1989), *aff'd* 162 A.D.2d 251, 559 N.Y.S.2d 125 (1990). We come to a similar

conclusion here. Plaintiffs' common law claims in effect challenge the plan of conversion and the Superintendent's final decision.[14] Section 256 provides that relief from the Superintendent's decision must be pursued in accordance with the Administrative Procedure Act. If no appeal is sought, the certificate of conversion is conclusive of the propriety of the conversion procedure. 9–B M.R.S.A. § 343(4)(B). Plaintiffs' assertion of common law claims in this matter amount to an improper collateral attack. The Banking Code and APA provide the exclusive remedy for alleged error in a mutual-to-stock conversion.[15]

## II.

■ With regard to question two, it is clear that, at the time of the conversion here in question, depositors in a mutual savings bank had no statutory right to vote by mail or by proxy on the association's conversion to stock ownership. The applicable provisions regarding account holder approval set forth in 9–B M.R.S.A. § 344(3) (as amended by P.L.1981, ch. 553), expressly provided that any eligible account holders not present at the meeting in person were to be regarded as having affirmatively voted for the conversion, and were to be counted towards the two-thirds required for approval of the plan. Because plaintiffs no longer seek to nullify the conversion by challenging the conversion procedure, we need not go any further to decide if any right to vote by mail or proxy derives from some other source.

## III.

Question Three lies at the heart of this case. In order to properly instruct the District Court on the question of whether depositors in a mutual savings bank have

---

**14.** Indeed, at page 57 of their brief to this court, plaintiffs characterize their common law claims:

Fundamentally, Plaintiffs' claim is that the procedure was flawed and the resulting decision substantively deprived Plaintiffs of their property without compensation.

Appellee's Brief at 57.

**15.** We have previously recognized, albeit in a different context, that a statutory scheme can displace common law causes of action. In *Jameson v. Cunningham,* 134 Me. 134, 136, 183 A. 131 (1936), we noted that when a statute covers the field and "provides entire regulation for relief it supersedes the common law, and furnishes the exclusive method of procedure...."

the enforceable right to a distribution of the association's net worth on conversion to stock form, we are required to examine the provisions of the Maine Banking Code and its legislative history, the Maine Savings Bank charter, and case law from this and other jurisdictions.

### A. The Banking Code

Section 131(27) of the Maine Banking Code defines a mutual financial institution as "any financial institution ... in which the earnings and net worth of the institution inure to the ultimate benefit of the depositors or members." As this definition and our cases make clear, depositors or members of a mutual savings bank hold a beneficial interest in the institution. *See, e.g., Savings Inst. v. Makin,* 23 Me. 360, 364 (1845) (depositors hold beneficial interest); *Androscoggin County Sav. Bank v. Campbell,* 282 A.2d 858, 860–61 (Me.1971) (savings bank encourage thrift among depositors by mutuality of ownership); *see also Paulsen v. Commissioner of Internal Revenue,* 469 U.S. 131, 134, 105 S.Ct. 627, 629, 83 L.Ed.2d 540 (1985) (federally-chartered mutual savings and loan "owned" by depositors). While the extent of this ownership interest will be discussed below, we are here concerned with whether the applicable statutes require a distribution of the institution's surplus to depositors on conversion. We conclude they do not.

9–B M.R.S.A. § 344 authorizes and governs the conversion of a mutual savings bank to a stock institution. The text of section 344 contains no requirement that a distribution of surplus be made to the mutual depositors as part of a plan of conversion.[16] The introduction to section 344 provides that the conversion must be "conducted in a manner equitable to all parties." Section 344(1) provides that the plan of conversion must "insure that the interest of depositors and account holders in the net worth of the institution are equitably pro-

vided for," and that the "conversion will not have an adverse impact on the stability of any other financial institution." Section 344(2)(B) requires that the plan provide "fair and equitable treatment to the depositors and to the institution." Section 344(6) requires the Superintendent to insure that the "safety and soundness of the institution" are protected. Section 253 of the Banking Code also requires that the Superintendent consider the effect of a conversion on the capital adequacy of the institution, and to consider the fairness and equities involved in any conversion. 9–B M.R.S.A. § 253(2)(B), (G).

Plaintiffs contend that the constant reference to "equitable" treatment in the statute, particularly the requirement that depositors' interest in the institution's net worth be equitably provided for, coupled with the statutory definition of "mutual financial institution," shows that they have an interest in the surplus of the bank that must be recognized in the form of cash or free stock on conversion. An examination of the genesis of 9–B M.R.S.A. § 344 indicates the contrary. Section 344 was enacted in 1975, shortly after the release of the *Report of the Governor's Banking Study Advisory Committee* (1974). The Committee's *Report* specifically addressed the issue here under consideration—whether a mutual financial institution should distribute surplus to depositors when it converts to stock form. The Committee expressly endorsed the "sale of stock" method of the FHLBB (which eschewed the free distribution method). Indeed, the Committee's recommended conversion criteria were specifically based on the FHLBB regulations. *Report of the Governor's Banking Study Advisory Committee* at 20, 48 (1974). The Statement of Fact accompanying L.D. 1134 (107th Legis.1975), clearly shows that the bill that became the 1975 Banking Code was based on the Advisory Committee *Report.*[17] The "sale of stock" and liquidation

---

16. *Compare* 9–B M.R.S.A. § 344 (no distribution requirement in mutual-to-stock bank conversion) *with* 24–A M.R.S.A. § 3477(G) (1990) (requiring distribution of cash or free stock to policy holders on conversion of mutual insurance company).

17. Indeed, the statements of legislators reflect their understanding that L.D. 1134 embodied the substantive recommendations of the Advisory Committee's *Report.* 2 Legis.Rec.B.1823, B.1830 (1975). One Senator remarked that the *Report* and bill tackled the "age-old problem" of

account method of conversion, supported by the Superintendent in Bureau of Banking Bulletin No. 41,[18] and employed by Maine Savings Bank in the instant case, was the method suggested to the legislature by the Governor's committee and presumably the method contemplated by the legislature when it enacted 9–B M.R.S.A. § 344. There is nothing in the language of the conversion statute or in the underlying legislative history that would indicate that a distribution of surplus to the depositors of a mutual savings bank is required on its conversion to stock form.

### B. The Maine Savings Bank Charter

■ The plaintiffs assert that the charter of the Portland Five Cents Savings Institution (the predecessor to Maine Savings Bank) provides that they are the beneficial owners of the bank and, therefore, entitled to a distribution of the institution's net worth. The relevant portion of the original 1859 charter is:

> hereby incorporated into a company by the name of Portland Five Cents Savings Institution, to be located in the City of Portland, with all the powers and privileges conferred upon similar institutions by the laws of this state, and subject to all the liabilities and restrictions thereof.

P. & S.L. 1859, ch. 328. Typical of those charters existing in 1859 whose terms are incorporated into the Portland Five charter is the charter of the Saco & Biddeford Savings Institution, created in 1827. The Saco & Biddeford Savings charter stated that "all deposits ... shall be used and improved to the best advantages, and the net income of profit thereof shall be by them applied and divided among the persons making such deposits." P. & S.L. 1827, ch. 446. Plaintiffs contend that a right to distribution on conversion is necessarily implied by the depositors' sole beneficial interest in all profits during the life of the association.[19] We disagree.

The Maine Banking Code, and not the 1859 Portland Five charter, controls the process and subject of depositors' rights on conversion to stock form.[20] 9–B M.R.S.A. § 511(1) (1980) provides:

> **1. Subject to corporation laws and this Title.** Each savings bank, lawfully organized, shall be subject to the laws of Maine regulating corporations in general, except as otherwise provided in this Title. The powers, privileges, duties and restrictions conferred and imposed upon any savings bank, by whatever name known, in its charter or act of incorporation, are so far abridged, enlarged or modified, that every such charter or act shall conform to this Title. Every such corporation possesses the powers, rights and privileges, and is subject to the

conversions. 2 Legis.Rec.B.1925 (1975) (statement of Sen. Berry).

**18.** Apparently, by issuing Bulletin No. 41, the Superintendent determined that a conversion plan that provided for a liquidation account and no distribution of surplus was "equitable to all parties" within the meaning of 9–B M.R.S.A. § 344. We accord deference to the Bureau of Banking's construction of the statute administered by it and will uphold such an interpretation unless that statute plainly compels a contrary result. *Senty v. Board of Osteopathic Examination & Regulation*, 594 A.2d 1068, 1072 (Me.1991). It is clear that in this case the statute does not compel a contrary interpretation.

**19.** In support of their argument that the Bank's charter compels a distribution on conversion, plaintiffs cite to a New Hampshire Supreme Court case, *Appeal of Concerned Corporators of the Portsmouth Savings Bank*, 129 N.H. 183, 525 A.2d 671 (1987), where the court reversed an order approving conversion, finding that a conversion plan that failed to preserve depositors'

charter rights to direct distribution of surplus was unfair to the depositors. *Id.* 525 A.2d at 679–85. An important distinction exists between the facts of this case and those in the *Portsmouth Savings Bank* case. In *Portsmouth Savings*, the bank charter *predated* the state's reservation of power to alter or amend corporate charters. *Id.* at 679, 688. A divided New Hampshire court hinged its decision on this point and held that the vested right to a solvent distribution contained in the charter could not be subsequently altered. In the instant case, however, the Maine legislature had reserved the power to amend charters twenty-eight years before the Portland Five (Maine Savings Bank) was created. *Portsmouth Savings Bank* is, therefore, distinguishable.

**20.** We have already concluded that the statutes contain no requirement of distribution of surplus to depositors on conversion. *See supra* Section IIIA.

duties, restrictions and liabilities conferred and imposed by this Title, anything in their respective charters or acts of incorporation to the contrary notwithstanding.

Such a law "regulating corporations in general" was P.L.1831, ch. 503, existing at the time of the creation of the Portland Five, that reserved to the state the right to alter, repeal, or override corporate charters at "the pleasure of the Legislature, in the same manner as if an express provision to that effect was contained" in the charter. P.L.1831, ch. 503. *See State v. Bohemier,* 96 Me. 257, 258–59, 52 A. 643 (1902); *see also Maine Unemployment Compensation Comm'n v. Maine Savings Bank,* 136 Me. 136, 139, 3 A.2d 897 (1939) (Maine Savings Bank, chartered in 1859, subject to general corporation laws then in force). In 1923, the legislature exercised its reserved powers and eliminated any vested rights to distributions during the solvency of the bank, making dividends and interest a purely discretionary decision by the board of directors. P.L.1923, ch. 144, § 34. Distribution of dividends is still a matter of discretion today. 9–B M.R.S.A. § 523 (1980). If any right to solvent distribution existed in the Portland Five (Maine Savings Bank) charter, it was taken away in 1923 and further, to the extent that the charter is in any way at odds with the Banking Code, the Banking Code controls, pursuant to 9–B M.R.S.A. § 511. Plaintiffs' assertion of a right to distribution based on the bank's charter must fail.

### C. Case Law

Plaintiffs cite numerous cases from this and other jurisdictions that state that depositors of a mutual savings bank hold a beneficial interest in the institution. We are unpersuaded by plaintiffs' argument that because they, as depositors, are "owners" of Maine Savings Bank, they are entitled to a distribution of the bank's surplus upon conversion, and conclude that depositors do not have an enforceable right to a distribution when the bank converts to stock form.

Courts have held consistently that the concept of "ownership" in the mutual savings context is quite different from our common understanding of equity ownership. *York v. Federal Home Loan Bank Bd.,* 624 F.2d 495, 499–500 (4th Cir.1980), *cert. denied* 449 U.S. 1043, 101 S.Ct. 621, 66 L.Ed.2d 504 (1980) (depositors interest is essentially that of creditor and only secondarily that of equity owner); *In re New York Sav. Bank,* 547 N.Y.S.2d at 500 (depositors' ownership interest is severely limited and not commensurate with equity ownership); *see Appeal of Concerned Corporators of the Portsmouth Sav. Bank,* 129 N.H. 183, 525 A.2d 671, 695 (1987) (*Souter, J.,* dissenting) (to speak of depositors' ownership in surplus invites confusion); *see also* A. Teck, *Mutual Savings Banks and Savings and Loan Associations: Aspects of Growth,* 13–14 (1968) (term "owner" should not be applied to depositors in any structural or functional sense). The United States Supreme Court has described the nature of a mutual savings depositor's ownership interest. In *Society for Sav. of Cleveland v. Bowers,* 349 U.S. 143, 75 S.Ct. 607, 99 L.Ed. 950 (1955), the Supreme Court held that depositors have only a nebulous and contingent interest such that the earnings of an operating mutual institution could not be attributed to the depositors for tax purposes:

> The asserted interest of the depositors is in the surplus of the bank, which is primarily a reserve against losses and secondarily a repository of undivided earnings. So long as the bank remains solvent, depositors receive a return on this fund only as an element of the interest paid on their deposits. To maintain their intangible ownership interest, they must maintain their deposits. If a depositor withdraws from the bank, he receives only his deposits and interest. If he continues, his only chance of getting anything more would be in the unlikely event of a solvent liquidation, a possibility that hardly rises to the level of an expectancy. It stretches the imagination very far to attribute any real value to such a remote contingency, and when coupled with the fact that it represents nothing which the depositor can readily

transfer, any theoretical value reduces almost to the vanishing point. *Id.* at 150, 75 S.Ct. at 611. Significant characteristics of ownership are missing in the mutual context. The depositors in a mutual institution have no legal title to the surplus of the institution and do not share in any risk of loss since their deposits are insured. The only "vested" interest a depositor has in the mutual institution is in the depositor's funds on account. These rights or interests remain unchanged in a conversion. *See York*, 624 F.2d at 500. A depositor's interest in a pro rata distribution of the bank's surplus is a mere contingency and cannot be realized unless the bank liquidates while solvent; an unlikely event. Plaintiffs are not entitled to receive cash or free stock for an interest that "hardly rises to the level of an expectancy." *Bowers*, 349 U.S. at 150, 75 S.Ct. at 611. The depositors' contingent claims to a distribution of surplus were adequately protected and preserved by the liquidation account set up as part of the Maine Savings Bank conversion.

Plaintiffs' attempts to equate a conversion with solvent liquidation (thereby triggering their contingent interests) are unavailing. The conversion of Maine Savings Bank from mutual to stock form cannot be considered a solvent liquidation. Plaintiffs' deposits remained the same after conversion, their deposits continued to be federally insured, and the bank still existed and provided the same (even expanded) services. Further, the Banking Code expressly distinguishes conversions from liquidations. *Compare* 9–B M.R.S.A. §§ 364 *and* 365 *with* §§ 344 *and* 357. 9–B M.R.S.A. § 357 provides that "even though the charter of any participating or converting institution has been terminated, the resulting institution shall be deemed to be a continuation of the entity of the participating or converting institution." It is clear that a conversion is something apart from a solvent liquidation, and does not trigger distribution rights.[21]

A review of the Banking Code and its legislative history, the Maine Savings Bank charter (in light of subsequent legislation), and the pertinent case law requires us to answer question three in the negative.[22] Because we do so, we are not required to address certified questions four and five.

In conclusion, we answer the certified questions as follows:

1. Plaintiffs' claims for relief asserted under Maine common law are barred by the certificate of conversion issued by the Superintendent of Banking on June 7, 1984 and the time limits for obtaining Judicial review of final agency action, 5 M.R.S.A. § 11002. We decline to answer question 1 as it relates to plaintiffs' claims asserted under Maine statutory law.

2. We decline to answer question 2.

3. In the absence of a charter provision providing any more than that set forth in chapter 328 of P. & S.L. of 1859, depositors in a mutual savings bank do not have the enforceable right to a distribution of the surplus of any bank when it converts to stock form pursuant to 9–B M.R.S.A. § 344.

4. We decline to answer question 4.

5. We decline to answer question 5.

All concurring.

---

**21.** Other courts have rejected the argument that a conversion is a liquidation. *See, e.g., In re East New York Sav. Bank Depositors Litig.*, 145 Misc.2d 620, 547 N.Y.S.2d 497, 500 (Sup.Ct. 1989), *aff'd* 162 A.D.2d 251, 559 N.Y.S.2d 125 (App.Div.1990); *Goldberg v. Philadelphia Sav. Fund Soc'y*, No. 5289, Slip op. at 12–13 (Pa.Ct. Comm.Pl. Aug. 10, 1983).

**22.** The creation and conversion of mutual savings banks is and historically has been controlled by the legislature. Whether the rights of depositors on conversion should be expanded is, therefore, more appropriately addressed in the legislative forum.