MAINE DRILLING & BLASTING, INC.

v.

INSURANCE COMPANY OF NORTH AMERICA.

Supreme Judicial Court of Maine.

Argued Feb. 27, 1995.
Decided Sept. 29, 1995.

Stephen Wade (orally), Skelton, Taintor & Abbott, Auburn, for Plaintiff.

James D. Poliquin (orally), Norman, Hanson & DeTroy, Portland, for Defendant.

Before WATHEN, C.J., and ROBERTS, GLASSMAN, CLIFFORD, RUDMAN, DANA, and LIPEZ, JJ.

RUDMAN, Justice.

■ Maine Drilling & Blasting, Inc. (Maine Drilling) instituted the present action in the United States District Court for the District of Maine claiming that the Insurance Company of North America (INA) wrongfully refused to defend and indemnify Maine Drilling in an action brought by Brox Industries, Inc. against Maine Drilling. Following the entry of a summary judgment in favor of INA, Maine Drilling appealed to the United States Court of Appeals for the First Circuit. The Court of Appeals, pursuant to 4 M.R.S.A. § 57 (1989) and M.R.Civ.P. 76B, has certified the following question to us for our instruction concerning a matter of state law:

> Does the Explosives Limitation Endorsement attached to the standard Comprehensive General Liability policy, when considered in conjunction with the business risk exclusions, j(5) and j(6), and any relevant history and general understanding of the insurance industry, create such an ambiguity that it should be interpreted against the insurer, i.e., that it should be read as providing business risk coverage for MD & B's claims against INA?

Because there is no dispute as to the material facts and our answer will be determinative of the case, the statutory requirements of our acceptance of the question have been met and our exercise of jurisdiction is proper. *Lovell v. One Bancorp*, 614 A.2d 56, 57 (Me. 1992). We answer the presented question in the negative.[1]

The factual background of the case, as certified to this Court, is summarized as follows. Brox Industries, Inc., an excavation contractor, subcontracted to Maine Drilling the blasting work necessary for the excavation required to construct a building. Maine Drilling was the named insured in a comprehensive general liability (CGL) policy issued by INA, to which an "Explosives Limitation Endorsement" was attached. After Maine Drilling had performed its work, Brox discovered that the blasting had caused the foundation ledge to be fragmented at a level lower than desired. Brox incurred expenses for extra excavation and additional structural gravel to raise the grade of the foundation to its planned level. Maine Drilling notified INA of the potential claim, seeking indemnity and defense costs, but INA refused to defend Maine Drilling in the ensuing litigation between Maine Drilling and the excavation contractor. This litigation resulted in arbitration and a stipulated judgment against Maine Drilling for approximately $330,000.

Maine Drilling brought the present action against INA alleging that INA had wrongfully refused to defend and indemnify Maine Drilling as required by the terms of its insurance contract. Although Maine Drilling conceded that coverage for Brox's claim ordinarily would be barred by certain exclusions contained in the policy, it contended that the attachment of the endorsement to the policy rendered the insurance policy ambiguous and that the ambiguous policy should be interpreted in favor of the insured. The District Court adopted the magistrate judge's recommendation that a summary judgment be entered in favor of INA on the ground that the insurance policy unambiguously excluded coverage for Maine Drilling's claims. Maine Drilling appealed.

The First Circuit concluded that, although we previously had held that the three specific exclusions in the CGL policy form were unambiguous in light of the distinction between

---

1. We limit ourselves to a response to the question posed and do not consider whether Brox's claimed damages resulted from an occurrence risk or a business risk.

business risks and occurrence of harm risks,[2] *Peerless Ins. Co. v. Brennon,* 564 A.2d 383, 386–87 (Me.1989), we never had addressed the construction of provisions in an attached endorsement that purport to modify such exclusions in a CGL policy. Accordingly, the Court of Appeals certified the issue to us.

INA contends that subsections (j)(5) and (j)(6) in the CGL policy,[3] which exclude coverage for "business risks," are not altered by any provision in the endorsement. According to INA, although the CGL policy form provides coverage for occurrence damages, the endorsement merely purports to limit the general coverage for occurrence damages by requiring Maine Drilling to pay a $25,000 deductible for property damage arising from its blasting activity and does not constitute a grant of coverage. As interpreted by INA, the endorsement simply increases the deductible payable for occurrence damages caused by blasting.

Maine Drilling concedes that subsections (j)(5) and (6) alone would exclude coverage but asserts the attachment of the endorsement creates an ambiguity as to coverage and the ambiguity is to be resolved against the insurer.

■■■ A contract of insurance, like any other contract, is to be construed in accordance with the intention of the parties, which is to be ascertained when there is ambiguity by examining the whole instrument. *Baybutt Constr. Corp. v. Commercial Union Ins. Co.,* 455 A.2d 914, 919 (Me.1983) (overruled on other grounds). A liability insurance policy must be construed to resolve all ambiguities in favor of coverage. *Massachusetts Bay Ins. Co. v. Ferraiolo Constr. Co.,* 584 A.2d 608, 609 (Me.1990).

Maine Drilling's CGL policy begins by providing that INA

**2.** A "business risk" is a risk that the contractor will not do his job competently and thus will be obligated to replace or repair his faulty work. An "occurrence of harm risk" is a risk that a person or property other than the product itself will be damaged through the fault of the contractor. *Peerless Ins. Co. v. Brennon,* 564 A.2d 383, 386 (Me.1989).

**3.** Exclusion (j) provides:

will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend any "suit" seeking those damages. We may at our discretion investigate any "occurrence" and settle any claim or "suit" that may result.

The attached endorsement reads as follows.

### THIS ENDORSEMENT CHANGES THE POLICY.
### PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

Commercial General Liability
Coverage Part

This insurance does not apply to "property damage" included within the "explosion hazard" or "underground property damage hazard" except as modified below:

### EXPLOSIVES LIMITATION ENDORSEMENT

This insurance will apply to those sums that the insured becomes legally obligated to pay as damages for occurrences included within the "explosion hazard" or "underground property damage hazard" which[sic] arise out of "covered operations" subject to the following schedule of deductibles:

Amount and Basis of Property Damage Liability Deductible $25,000 per occurrence for intentional detonation $0 per occurrence for unintentional detonation

The following definitions are added.

> "this insurance does not apply to 'property damage' to ... (5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the 'property damage' arises out of those operations; or (6) That particular part of any property that must be restored, repaired or replaced because 'your work' was incorrectly performed on it."

a. "Covered Materials" shall mean the following products:

Explosives, blasting agents, blasting materials, blasting supplies, and related products such as, but not limited to, ammonium nitrate, T.N.T., black powder, non-nitroglycerine explosives, nitroglycerine explosives, detonating cord, blasting caps, safety fuse, smokeless powder, nitro-carbon-nitrates, slurries, emulsions, explosives gels, and various carbonaceous material including fuel oil.

b. "Job site" means the premises where "covered materials" are to be used for their intended purposes or delivered to and received by the customer or his agent or consignee prior to use for their intended purposes.

c. "Covered operations" means the intentional detonation of the "covered materials" at a "job site" with your personnel present, or unintentional detonation of "covered materials" while being manufactured, prepared, processed, transported, or stored, other than when in or on an automobile. Storage includes loading or unloading of "covered materials" from a mobile magazine while such magazine is disconnected from an automobile power unit and parked at a temporary or permanent location.

d. "Explosion hazard" includes property damage arising out of blasting or explosion. The "explosion hazard" does not include "property damage" arising out of the explosion of air or steam vessels, piping under pressure, prime movers, machinery or power transmitting equipment.

e. "Underground property damage hazard" includes "underground property damage" and any resulting "property damage" to any property at any time.

f. "Underground property damage" means property damage to wires, conduits, pipes, mains, sewers, tanks, tunnels, any similar property, and any apparatus used with them beneath the surface of the ground or water, caused by and occurring during the use of explosives or mechanical equipment for the purpose of grading land, paving, excavating, drilling, mining, borrowing, filling, back-filling or pile-driving.

The insurance shall not apply to "property damage" arising from:

a. The demolition by you or others working on your behalf, of man made structures or from tunnel construction (including mine shafts, road tunnels, railroad tunnels and other large diameter tunnels used for water mains, sewer lines, etc., not open excavation) operations including, but not limited to, the preparing, approving or failing to approve maps, drawing, opinions, reports, surveys, change orders, designs, or specifications and supervisory inspection or engineering services related to demolition of man made structures and tunnel construction.

b. Shot coal.

c. Poor breakage, including any failure to obtain desired fragmentation or fracture.

d. Transportation by an automobile or loading or unloading of any automobile.

It is understood and agreed that Exclusion M of the Commercial General Liability Coverage Form is deleted in its entirety, as respects "covered materials" manufactured by an Insured, and replaced by the following:

m. "Property damage" to "impaired property" or property that has not been physically injured, arising out of:

(1) A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

(2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

As we said in *Peerless Ins. Co. v. Brennon,* 564 A.2d at 384–85:

Whether a given insurance contract is ambiguous is a question of law for the court. *E.g., Banker's Life Ins. Co. of Nebraska v. Eaton,* 430 A.2d 833, 834 (Me.1981). "The language of a contract of insurance is ambiguous if it is reasonably susceptible of different interpretations." *Brackett v. Middlesex Ins. Co.,* 486 A.2d 1188, 1189

(Me.1985). In addition, "[a] policy is ambiguous if an ordinary person in the shoes of the insured would not understand that the policy did not cover claims such as those brought...." *Allstate Ins. Co. v. Elwell*, 513 A.2d 269, 271 (Me.1986). Nevertheless, "[t]he court must interpret unambiguous language in a contract according to its plain and commonly accepted meaning." *Brackett v. Middlesex Ins. Co.*, 486 A.2d at 1190. Finally, in determining whether an insurance contract is ambiguous, the long-standing rule in Maine requires an evaluation of the instrument as a whole.

> A contract of insurance, like any other contract, is to be construed in accordance with the intention of the parties, which is to be ascertained from an examination of the whole instrument. All parts and clauses must be considered together that it may be seen if and how far one clause is explained, modified, limited or controlled by the others.

*Swift v. Patrons Androscoggin Mut. Fire Ins. Co.*, 125 Me. 255, 256, 132 A. 745, 746 (1926).

The policy in this case, read with its endorsements, is unambiguous. Subsections (j)(5) and (j)(6) serve to limit the coverage to that property damage occurring to property other than that on which the insured is to perform its work. The endorsement confirms coverage for "occurrence of harm" blasting risk, albeit at a higher deductible. The endorsement by its plain language does not extend coverage where coverage did not exist, but provides for a deductible where coverage does exist. The exclusions contained in subsections (j)(5) and (j)(6) are unaffected by the plain language of the Explosives Limitation Endorsement.

We answer the certified question in the negative.

WATHEN, C.J., and ROBERTS, CLIFFORD and LIPEZ, JJ., concurring.

GLASSMAN, Justice, with whom DANA, Justice, joins, dissenting.

I am appreciative of the language of the question certified to the Court. Because, however, I conclude that the damages sought by the claim of Brox Industries, Inc. against Maine Drilling and Blasting, Inc. resulted not from a business risk but from an occurrence of harm risk for which the endorsement to the insurance policy at issue unambiguously provided coverage, I must respectfully dissent.

In the first instance, it must be noted that the Insurance Company of North America does not contend that (j)(5) and (j)(6) exclude coverage for an occurrence of harm risk. It asserts that the "only category of claims (j)(5) and (j)(6) remove from coverage are claims for the very property into which Maine Drilling is drilling and detonating explosives."

Typically, a comprehensive general liability policy provides coverage for an occurrence of harm risk and excludes coverage for a business risk. In *Peerless*, we noted that distinction by explaining that

> [a]n "occurrence of harm risk" is a risk that a person or property other than the product itself will be damaged through the fault of the contractor. A "business risk" is a risk that the contractor will not do his job competently, and thus will be obligated to replace or repair his faulty work.

*Peerless Ins. Co. v. Brennon*, 564 A.2d 383, 386 (Me.1989). *See also Travelers Ins. Co. v. Volentine*, 578 S.W.2d 501, 503–04 (Tex.Civ. App.1979) (liability policy containing business risk exclusion does not insure policyholder against liability to repair or replace own defective work or product, but provides coverage for liability for damages to other property resulting from defective condition of work); *Bundy Tubing Co. v. Royal Indem. Co.*, 298 F.2d 151, 154 (6th Cir.1962) (cost of replacing defective tubing excluded from coverage but cost of tearing out concrete floor to remove tubing within coverage).

Critical to the issue of distinguishing between an "occurrence of harm risk" and a "business risk" is defining the work product. The scope of the contractual performance defines the work product. *Travelers Ins. Co. v. Volentine*, 578 S.W.2d at 504. Once the work product has been defined, the issue becomes whether the claimed damages are "directly related to the cost of repairing and

replacing deficiencies in [the contractor's] work on the project—and therefore excluded from the CGL coverage as business risks— [or] are claims beyond the scope of the contractual expectations for additional tort damages caused by the alleged deficiencies in [the contractor's] performance." *Glens Falls Ins. Co. v. Donmac Golf Shaping Co., Inc.,* 203 Ga.App. 508, 417 S.E.2d 197, 201 (1992).

The contract between Brox and Maine Drilling provides that Maine Drilling was to blast an estimated 30,752 cubic yards of open ledge at $5.55 per cubic yard and 1,880 cubic yards of trench ledge at $22 per cubic yard. The ledge was to be blasted "to size that will be crushed for base course materials."

In its action against Maine Drilling, Brox did not seek damages for Maine Drilling's faulty performance of its contractual obligation to blast a specific amount of ledge to a certain size, which would be a business risk. Rather, it sought recovery of its cost for the extra work incurred by it for the repair of damage to the underlying ledge alleged to have been caused by Maine Drilling's "over-blasting." Because Brox's claim against Maine Drilling is beyond the scope of the parties' contractual expectations and is for damages to property other than the product itself caused by alleged deficiencies in Maine Drilling's performance, exclusions (j)(5) and (j)(6) are not applicable, and the sole issue becomes whether Maine Drilling has insurance coverage for an occurrence of harm risk. *Peerless Ins. Co.,* 564 A.2d at 386; *Glens Falls Ins. Co.,* 417 S.E.2d at 201.

Prior to 1986, and to the date of the policy at issue in this case, the standard comprehensive general liability policy contained exclusion (q) expressly excluding coverage for property damage arising out of blasting or explosion. The instant policy provides no such exclusion. Accordingly, in the absence of an endorsement, the present policy provides coverage to Maine Drilling for all "property damage," defined as "physical injury to tangible property, including all resulting loss of use of that property."

Here, the first sentence of the endorsement uses the exact wording of exclusion (q) as it appeared in the body of the standard comprehensive general liability policy issued before 1986. Insurance Company of North America concedes that "when this old form was in use, it was necessary for those involved in the blasting business to obtain an endorsement that would partially override exclusion (q)."

An examination of the language of the endorsement discloses that it provides insurance to Maine Drilling for property damage arising from its blasting activity if the property damage arises from the intentional detonation of explosives at the job site with its personnel present. The exclusions set forth in the endorsement, including the business risk of "[p]oor breakage, including any failure to obtain desired fragmentation or fracture," are not applicable to the present case.

Accordingly, I would respond to the certified question that on the undisputed facts of this case, the Explosives Limitation Endorsement attached to the standard Comprehensive General Liability policy provides coverage for Brox's claims against Maine Drilling.