OPINION OF THE COURT
Ira Gammerman, J.
This motion is brought to dismiss the consolidated class action complaint brought by individual depositors of defendant East New York Savings Bank (East New York), objecting to the recent conversion of East New York from a mutual savings bank to a stock corporation and its subsequent merger with defendant First Empire State Corporation (First Empire). It is plaintiffs’ contention that they, as depositors of East New York, were entitled to profit from the conversion and that their failure to do so was caused by fraud and self-dealing on the part of the defendants. In their complaint plaintiffs seek a rescission of the conversion-merger plan, or, alternatively, money damages in an unspecified amount.
As required under the General Regulations of the Banking Board (3 NYCRR part 86 et seq.) East New York approved an initial version of the plan of conversion on July 1, 1987, by a vote of its board of trustees. The application for conversion was approved by the Superintendent of Banks on October 15, 1987 (3 NYCRR 86.4 [a] [1]). Pursuant to the banking regulations (3 NYCRR 86.4 [a]), the conversion plan, was then presented to the depositors for approval, which was obtained by a vote taken at a special meeting held on December 7, 1987. The plan received the final approval of the Superintendent of Banks on December 24, 1987.
The conversion plan offered East New York depositors the option to subscribe to purchase shares of First Empire stock at a fixed price of $46.50 per share, which was the "preannouncement” price as of July 30, 1987, or the price as of the date on which the stock was issued, whichever price was lower.
Following the public announcement of the pending conversion and merger, the price of First Empire stock rose appreciably from $46.50 to nearly $59 per share, so that it appeared that those depositors of East New York who chose to subscribe to purchase First Empire stock at the preannouncement price would profit considerably from the conversion. Unfortunately, *622 fate, in the form of the October 19, 1987 "Black Monday” stock market crash, intervened, sending the price of First Empire stock plummeting to a point far below the preannouncement price. Thus, the benefit to be derived from subscribing to purchase at the formerly satisfactory offered price was completely lost.
Plaintiffs’ claim rests essentially on the premise that they, as depositors in the mutual savings bank, possessed an ownership interest in the considerable assets of East New York, which interest would have to be recognized and protected in any conversion of the bank to stock or ownership. Therefore, plaintiffs argue, they were entitled by their status as depositors and owners of East New York to profit financially from the conversion, and defendants’ failure to terminate the proposed plan, following events which effectively negated that profit, amounted to fraud and a breach of fiduciary duty, of sufficient gravity and magnitude to warrant rescission of the entire transaction.
Plaintiffs argue that it is usual, indeed expected, that the depositors of a mutual savings bank will profit financially from a conversion, but that defendants’ use of a conversion, followed immediately by a merger with First Empire, eliminated any profit plaintiffs would certainly have received from a conversion standing alone, and added only to the financial well-being of the defendants. Plaintiffs claim that the proxy materials provided to the depositors should have apprised plaintiffs of this fact, and also failed to adequately assess the impact on plaintiffs of the fall in stock prices. According to plaintiffs, these omissions, and others, amounted to a fraud on the depositors, motivated by defendants’ own self-interests, and that such fraud and breach of fiduciary duty was aided and abetted by the actions of First Empire in acquiescing to the plan.
It is defendants’ position, in which they are joined by the New York State Banking Department (the Department) as amicus curiae, that plaintiffs received their full due under the terms of the plan, as approved by the Superintendant, and by a vote of all the depositors, and were entitled only to those rights and benefits provided by the Banking Department regulations and the New York Banking Law. It is defendants’ position that neither the regulations nor the Banking Law entitled plaintiffs to receive any guaranteed profit upon the conversion of a mutual savings bank to stock form. Defendants deny that the proxy materials contained any material *623 omissions, and argue that the entire complaint is no more than an impermissible collateral attack on the approval of the plan granted by the Banking Board and that any complaints plaintiffs may have with respect to the plan should have been raised earlier in a CPLR article 78 proceeding.
The conversion of a mutual thrift institution to stock ownership is permitted, and even encouraged, by the Banking Department as a means to ensure the continuing health of the banking industry. (3 NYCRR 86.1 [a]; Banking Law § 14-e.) The Banking Department is entrusted with the duty of supervising and regulating such conversions. (Banking Law §§ 14, 14-e.) The applicable regulations, contained in 3 NYCRR part 86, specifically permit a conversion to stock form followed by a merger, such as occurred here. (3 NYCRR 86.6, 16.3 [a] [2].) The form and content of the proxy statement which is to be distributed to the bank’s depositors is suggested in 3 NYCRR 86.14, and the regulations specify that the plan and proxy materials may not contain material misrepresentations or omissions, which would amount to fraud or deceit upon the. purchaser of the stock. (3 NYCRR 86.4 [h].)
Clearly, the guaranteed profit which plaintiffs claim is their right is nowhere promised by defendants or authorized in the Department’s regulations. In fact, the Department insists that any such guaranteed profit or payout to a bank’s depositors upon conversion to stock form is prohibited under the regulations and Department policy, since such a payout would serve to undermine the very purpose of the conversion, which is to strengthen and recapitalize the institution and the industry. Rather, the regulations provide that the depositors are entitled to retain their accounts in the newly formed corporation (3 NYCRR 86.4). If the plan so provides, depositors are entitled to subscribe to purchase stock in the new corporation. Defendants argue that all of these rights were accorded plaintiffs and, thus, plaintiffs are not entitled to relief.
Plaintiffs’ underlying theory, that the depositors of a mutual savings bank are the sole owners of the bank’s assets so as to entitle those depositors to share in the bank’s assets, or the equivalent, upon conversion, is not valid. While it is indisputable that the depositors are the "owners” of the equity in a mutual savings bank (Paulsen v Commissioner, 469 US 131 [1985]) this ownership interest is severely limited, and does not amount, as plaintiffs insist, to an interest commensurate with the common, everyday experience of "ownership”. The depositors are essentially the creditors of the institution, *624 entitled only to protection upon conversion to the extent of the amount of their accounts, which continue in the new institution. (York v Federal Home Loan Bank Bd., 624 F2d 495, 500 [4th Cir 1980], cert denied 449 US 1043 [1980].) In the extremely unlikely circumstance of a "solvent liquidation” of a mutual savings institution it has been postulated that the depositors, as owners, would then share in the liquidating bank’s surplus (see, Society for Sav. v Bowers, 349 US 143, 150 [1955]). However, the conversion of a mutual savings bank to a stock company immediately followed by a merger, which results in a financially healthy institution, simply cannot be likened to a liquidation of the institution, solvent or otherwise. There is no merit to plaintiffs’ claim that their "ownership” rights entitle them to a share of the bank’s assets, or to a guaranteed profit upon conversion. Plaintiff’s reliance on the case of Appeal of Concerned Corporators of Portsmouth Sav. Bank (125 NH 183, 525 A2d 671 [1987]) is misplaced, as in that case the depositors had a statutory and contractual right to share in the bank’s surplus. Thus, plaintiffs were not deprived of any legal rights or entitlements. Consequently, any claim that the plan was deficient in that it failed to ensure a profit to plaintiffs is without merit. And to the extent that plaintiffs argue for rescission of the plan for failing to provide for plaintiffs’ enrichment, they are, indeed, collaterally attacking the Banking Board’s approval of the plan in an untimely and improper manner.
Plaintiffs argue that they are not opposing the plan "per se”, or the Department’s approval of the plan, but instead base their action solely on fraud and breach of fiduciary duty, in that the plan was not structured to maximize plaintiffs’ profit. Plaintiffs point to the Department’s letter of approval dated October 15, 1987, in which the Department noted that "[s]uch approval does not address the financial merits” of the plan, as indicating that the Department’s approval only ran to the form of the plan, that is, to its legal validity, and not its financial content. However, the legal validity of the plan is not easily separated from its financial content. For example, the form of the plan, a conversion followed by a merger, is perfectly proper under the Department’s regulations, and was duly approved by the Department. As a result, plaintiffs’ objection to this form, on the theory that a conversion standing alone would have realized a greater profit for plaintiffs (and one to which they were entitled) is still an attack on the form of the plan itself, notwithstanding that it is couched in *625 terms of the defendant trustees’ breach of their duty to act as plaintiffs’ fiduciaries. Similarly, plaintiffs’ claim that the plan should have been renegotiated after the stock market crash in order to provide for plaintiff’s benefit is an attack on the sufficiency of a plan that was approved by the Department. The court does not accept plaintiffs’ argument that the question of the financial sufficiency of the plan can somehow be separated from its legal sufficiency so as to warrant rescission in this plenary action of a conversion plan duly approved by the proper agency.
The only aspects of plaintiffs’ claim which remain, and which can be the basis of a plenary action, are the allegations of fraud, and breach of fiduciary duty arising from that alleged fraud, in the preparation of the proxy materials. These claims, however, can only be asserted against the individual trustees in their individual capacities and only damages can be sought. (Compare, Greenthal & Co. v Lefkowitz, 32 NY2d 457, 463 [1973] [tenant in cooperative conversion may bring a plenary action for fraud against the sponsors, although barred from proceeding against the plan itself].)
Plaintiffs claim that the proxy statement issued on November 13, 1987 fraudulently omits information which plaintiffs required in order to adequately assess the merits of the conversion plan. Specifically, plaintiffs claim that defendants were obligated to describe the nature of the depositors’ equitable interest as owners of the savings bank, and the fiduciary duty owed to them by the trustees, were required to state that the plan had originally called for the depositors to make a profit which had been lost because of the stock market fall, and that First Empire would now realize a "windfall” as a result. Plaintiffs argue that they should have been informed that depositors in other mutual savings banks had received a benefit upon conversion of those institutions.
Plaintiffs rely on the case of TSC Indus. v Northway, Inc. (426 US 438 [1976]), in which the United States Supreme Court established a standard by which to judge the materiality of a fact included or omitted from a proxy statement in actions brought pursuant to section 14 (a) of the Securities and Exchange Act (15 USC § 78n [a]), and the Securities Exchange Commission regulations (17 CFR 240.14a-3, 240.4a-9). The court determined that an omitted fact was material "if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote”, or if there were a substantial likelihood that "the omitted fact *626 would have been viewed by the reasonable investor as having significantly altered the ’total mix’ of information made available.” (Supra, at 449.)
In subsequent section 14 (a) cases, the Federal courts have acknowledged that certain types of facts are simply not necessary to the deliberations, of the reasonable shareholder. A proxy statement need not contain "speculative financial predictions” (Rodman v Grant Found., 608 F2d 64, 72 [2d Cir 1979]), nor need it "characterize disclosed information” (Mendell v Greenberg, 612 F Supp 1543, 1550 [SD NY 1985]), nor refer to transactions made by competitors (Flum Partners v Child World, 557 F Supp 492, 497 [SD NY 1983]) nor other possible transactions unrelated to the one in question (Mendell v Greenberg, supra, at 1551).
A review of the proxy statement and subscription offering reveals that the defendants were in substantial compliance with the requirements of 3 NYCRR 86.14 as to the contents of the proxy statement, and that the information which plaintiffs claim was omitted either was included, or was not material to the deliberations of a reasonable shareholder.
Defendants were not required to inform plaintiffs of their equitable interest in the ownership of the bank’s assets, since such ownership rights have been shown to be minimal and largely irrelevant to the transaction, as long as plaintiffs’ accounts were maintained and continued in the new institution. Defendants were not required to inform plaintiffs as to any other conversions of mutual savings banks which may have taken place, or to describe other forms which the conversion could take. Nor were defendants obligated to predict that plaintiffs would, or should, make a profit on the conversion, as such is not the case, and is, at best, speculative and potentially misleading.
Defendants were certainly not obligated to make predictions concerning the fluctuations of the stock market. It is common knowledge that stocks change in price, and the stock market crash made headlines worldwide. In addition, the stock subscription form included with the proxy materials contained several direct references to the then recent fall in stock prices in general, and First Empire stock in particular, including a comparison of prices at their highest and lowest during the period July to November 1987, following the Board’s approval of the plan. The volatility of the stock price was evident, as was the fact that the stock, as of November 1987, sold at a *627 price below $46.50 a share. A reasonable reader could not help but reach the conclusion that the subscription price was no longer particularly favorable. This information is neither buried nor disguised in the financial material and was available to permit a reasonable appraisal of the plan.
The proxy statement was not tainted by material omissions, and the claims of fraud and breach of fiduciary duty arising from these alleged omissions have no basis. Plaintiffs’ complaint, therefore, must be dismissed in its entirety.
If plaintiffs hope to realize a profit from the conversion of East New York to a stock company, and from its merger with First Empire, it is not defendants who prevented those hopes from being realized. It was rather, the events of October 19, 1987. Sadly, plaintiffs are not alone in having sustained a loss because of the October 1987 crash. Plaintiffs, however, cannot seek recompense for their perceived losses from these defendants.
The motion to dismiss the complaint is granted and the clerk is directed to enter judgment in favor of the defendants reflecting this dismissal.