Ann B. **LOVELL, Individually and as Personal Representative of the Estate of John Lovell and Mary Campbell, Plaintiffs,**

v.

**The ONE BANCORP, et al., Defendants.**

Civ. No. 87–0296 P.

United States District Court, D. Maine.

March 31, 1993.

Richard Poulos, John Campbell, Portland, ME, for plaintiff Ann Lovell and Mary Campbell.

Roger Putnam, Verrill & Dana, Portland, ME, for defendant One Bancorp and Maine Sav. Bank.

Rufus Brown, Harold Woodsum, Drummond, Woodsum, Plimptom & MacMahon, Portland, ME, for defendant Frederick Pape.

James St. Clair, Hale & Dorr, Boston, MA, for defendant Nancy Masterton and Masterton, Estate of.

Thomas Warren, Asst. Atty. Gen., Augusta, ME, for defendant H Dematteis.

GENE CARTER, Chief Judge.

## MEMORANDUM AND ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

In this action Plaintiffs challenge the lawfulness of Maine Savings Bank's conversion from mutual to stock form in June 1984, and the administrative orders approving the conversion issued by the Maine Bureau of Banking. The parties filed numerous motions for summary judgment. (Docket Nos. 70, 72, 74, 75, 78). Finding both that there were certain questions of Maine law which might be determinative of the cause and that there were no controlling Maine precedents on those issues, this Court certified five questions of Maine law to the Supreme Judicial Court of Maine sitting as the Law Court, by order entered on February 5, 1991. (Docket No. 134).[1] The Law Court accepted the cer-

---

1. A few days before this Court's certification order, Maine Savings Bank failed and the Federal Deposit Insurance Corporation (FDIC) was appointed its receiver. The FDIC, therefore, has been substituted for Maine Savings as a Defendant here. In June 1992, The One Bancorp

tification and issued its opinion answering three of the questions[2] in August, 1992. *Lovell v. One Bancorp*, 614 A.2d 56 (Me.1992) (Docket No. 147A). Defendants then filed renewed motions for summary judgment, which are now before the Court. (Docket Nos. 163, 161, 159, 0–0).[3]

Under Federal Rule of Procedure 56(c), summary judgment must be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." As the Court of Appeals for the First Circuit has recently stated:

When, as here, the movant-defendant has suggested that competent evidence to prove the case is lacking, the burden devolves upon the nonmovant-plaintiff to "document some factual disagreement sufficient to deflect brevis disposition." ...

This burden is discharged only if the cited disagreement relates to a genuine issue of material fact.... "In this context, 'genuine' means that the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party [and] 'material' means that the fact is one that might affect the outcome of the suit under the governing law." ... This requirement has sharp teeth: the plaintiff "must present definite, competent evidence to rebut the motion." ...

*Wynne v. Tufts University School of Medicine*, 976 F.2d 791, 793 (1st Cir.1992) (citations omitted).

In presenting the case to the Law Court, this Court set forth the material undisputed facts established by the evidentiary record prepared by the parties in connection with their then-pending motions for summary judgment. Those facts, which still remain undisputed, and other undisputed material facts disclosed by the record are set forth below.

Maine Savings Bank was originally incorporated as the Portland Five Cent Savings Institution pursuant to Chapter 328 of the Private and Special Laws of Maine of 1859. Chapter 328 provided that the bank would be subject to the laws of Maine. Its passbooks and other documents governing accounts explained that they were subject both to Maine and federal law and to the bank's bylaws. Prior to its conversion to stock form in June 1984, Maine Savings Bank operated as a mutual financial institution within the meaning of the Maine Banking Code, 9–B M.S.R.A. § 111 *et seq.*

On December 30, 1983, Maine Savings Bank filed with the Maine Bureau of Banking an application to convert to stock form under 9–B M.R.S.A. § 344. The application included a Plan of Conversion which had been unanimously adopted by the Bank's Board of Trustees on December 15, 1983.

The Plan provided that Maine Savings Bank would convert to stock form and issue all of its stock to The One Bancorp, a holding company formed for the purpose of acquiring and holding the newly issued stock of Maine Savings Bank. The One Bancorp would then offer all of its stock for sale, first to eligible account holders, (account holders as of August 31, 1983, with aggregate balances in excess of $50.00) in a subscription offering. The price of the shares would be equal to the *pro forma* (that is, post conversion) fair market value of the stock, based upon an independent appraisal. Shares not subscribed for by eligible account holders would be offered, in descending order of priority, to other account holders, bank personnel, and

commenced bankruptcy proceedings. The case is stayed as to Defendant The One Bancorp.

**2.** Because of Plaintiffs' representations about the relief they are seeking and the Law Court's response to the three questions answered, no response was required to the remaining two questions.

**3.** Defendants Pape and Estate of Masterton, the individual bank Defendants, have adopted the memorandum of law filed by Defendant FDIC and have presented other arguments specific to their own motions for summary judgment. Superintendent of Banking DeMatteis, who was previously dismissed as a Defendant on certain claims, has filed a renewed motion as to Counts I, II, and XI, presenting arguments very similar to those presented by the FDIC and the other individual Defendants.

the public, at the same *pro forma* fair market value. In connection with the transfer of Maine Savings Bank stock to The One Bancorp, the Plan also provided that The One Bancorp would allocate to Maine Savings Bank a portion of the conversion proceeds from the sale of stock of The One Bancorp sufficient to maintain the Bank's existing capital-to-asset ratio.

The Plan did not provide for the distribution of any cash, or any free or discounted stock, to existing or eligible account holders of the Bank. All shares of stock of The One Bancorp were to be sold to account holders, officers or employees, and the public, at a uniform price based upon an independent outside appraisal.

The Plan provided for the creation of a liquidation account, setting forth the priorities for the distribution of any net surplus of Maine Savings Bank in the event that the Maine Savings Bank liquidated while solvent within ten years following the conversion. The liquidation account was not a separate pool of funds, but an accounting memo entry of a contingent liability against the Bank. Each eligible account holder's interest in the liquidation account (the account holders' sub-account balance) would decline as withdrawals were made from his or her deposit account. The liquidation account would terminate in any event ten years after the conversion. The Plan also imposed restrictions on the dividends that could be paid by Maine Savings Bank to The One Bancorp. Dividends were limited for the three years following the conversion to 50% of Maine Savings Bank's earnings, and further limited so as to prohibit dividends that would reduce the stated net worth of Maine Savings to an amount below the balance of the liquidation account.

The Plan set limits on the purchase of The One Bancorp stock by any one person and by Maine Savings Bank officers and trustees. No person was permitted to acquire more than 5% of the stock issued in connection with the conversion. Trustees, officers, and their associates as a whole were not permitted to acquire more than 25% of the stock, except in the event of death. For a period of one year following the conversion, trustees and officers could not sell their stock. The Plan also authorized the Board of Directors to adopt a stock option and stock appreciation rights plan and an employee stock purchase plan following the conversion, subject to ratification by the common stockholders of The One Bancorp, and subject to a limit on the option plan of 7½% of the total shares sold in the conversion.

The substantive terms of Maine Savings Bank's Plan were essentially the same as those required by the Federal Home Loan Bank Board (FHLBB) regulations governing the mutual-to-stock conversion of FHLBB-regulated savings and loan associations and federally chartered mutual savings banks, 12 C.F.R. Part 563b, with the exception that the liquidation account established by Maine Savings Bank's Plan of Conversion was limited to a term of ten years. The Bureau of Banking had issued Bulletin 41 in August 1983 stating that these FHLBB regulations contained guidelines for the contents of a plan of conversion that could be used by Maine-chartered financial institutions which sought Bureau approval for a mutual-to-stock conversion plan. Bulletin 41 did not purport to be a judicially enforceable rule or regulation within the meaning of the Maine Administrative Procedure Act (MAPA), and the Bureau has never adopted rules or regulations governing the contents of a plan of conversion.

On January 6, 1984, the Maine Bureau of Banking notified Maine Savings Bank by letter that its application for approval to convert had been accepted for filing. In this letter the Superintendent instructed Maine Savings Bank to publish notice of the filing of its application in various newspapers, and specified the form and substance of the notice to be published. The Superintendent did not direct Maine Savings Bank to mail a copy of this notice to each of its eligible account holders. The notice stated, among other things, that interested parties could submit comments on Maine Savings Bank's application, and that a hearing would be held upon receipt of a *bona fide* and reasonable request by an interested party. Maine Savings Bank caused this notice to be published in various newspapers on January 20 and January 27,

1984, in accordance with the Superintendent's instructions. No written comments or requests for hearing on the application were ever received by the Bureau of Banking, and no hearing on the application was held.

On April 2, 1984, the Maine Bureau of Banking issued an order conditionally approving Maine Savings Bank's Plan of Conversion pursuant to 9–B M.R.S.A. § 344. The Superintendent of Banking believed that the purpose of allowing conversions was to raise capital. He would not have approved a conversion plan that would decrease the capital of the bank and did not think distribution of stock to account holders would be beneficial. The Superintendent also believed, in accordance with the findings of the FHLBB, that if converting mutual savings banks in Maine paid distributions to account holders at the time of conversion, a substantial number of deposits might be induced to move from stock institutions, where no such windfall was possible, to mutual institutions which might still convert so they might participate in such distributions. This phenomenon, in his opinion, would be disruptive to the financial system.

On April 19 and 21, 1984, Maine Savings mailed to each account holder a notice of a special meeting of account holders to take place on May 11, 1984, at which account holders could vote for or against the Plan of Conversion. The mailing included both a summary description of and the full Plan of Conversion, and stated, in accordance with 9–B M.R.S.A. § 344(3), as amended by PL 1981, Ch. 553, that unless the account holder personally appeared at the meeting to vote "no," he or she would be deemed to have voted "yes" in favor of the Plan. The notice also stated that the Plan of Conversion had been approved by the Bureau of Banking, and that any petition for judicial review of the Bureau's approval of the Plan needed to be filed in the Superior Court of the State of Maine no later than 40 days after the decision was rendered. The mailing also included a subscription offering prospectus for shares of The One Bancorp, and a brochure describing the essential terms of the Plan.

The Subscription Offering period extended from April 17, 1984 to May 17, 1984. During that time, 627,295 of the 3.6 million shares to be offered by The One Bancorp were subscribed—approximately 17.4% of the offering. Approximately 2,500 account holders of Maine Savings Bank subscribed for shares in The One Bancorp. Plaintiffs Lovell and Campbell did not subscribe for any shares. The trustees and executive officers of Maine Savings Bank collectively subscribed for 90,208 of the 3.6 million shares offered—approximately 2.5% of the total offering.

On May 11, 1984, Maine Savings held the Special Meeting of Account Holders to vote on the Plan of Conversion. At the special meeting, twenty-six account holders in attendance voted for the Plan of Conversion, nine of the account holders in attendance voted against the Plan of Conversion, and two of the account holders in attendance abstained from voting. In accordance with 9–B M.R.S.A. § 344(3) and the Plan of Conversion, the 88,867 account holders who were not present at the Special Meeting in person, including Plaintiffs, were deemed to have affirmatively voted for the Plan. Thereafter Maine Savings Bank certified to the Superintendent that the account holders had approved the Plan of Conversion by a majority vote.

On June 7, 1984, the Superintendent issued a Certificate of Conversion, pursuant to 9–B M.R.S.A. § 343(4)(B) and 344(4), reciting that Maine Savings Bank had been legally converted from mutual to stock form effective upon the receipt of proceeds from the sale of its stock, and that the conversion was in compliance with Maine and federal law. On June 12, 1984, The One Bancorp sold the remaining (unsubscribed-for) 2,972,705 shares of its stock in a public offering, at a price of $13.00 a share. An outside, independent appraiser filed a letter with the Superintendent of Banking certifying to the fairness of this price.

The combined proceeds from the subscription offering and public offering of The One Bancorp's stock amounted to $46.8 million. In addition, on June 21, 1981, the underwriters for the public offering exercised their option to acquire an additional 100,000 shares of The One Bancorp at the initial offering price of $13.00 per share, thereby grossing

an additional $1.3 million. Net of underwriter discounts on the shares sold publicly and other conversion expenses, The One Bancorp realized $43,678,000 from the sale of The One Bancorp stock incident to the conversion. In accordance with the conditions attached to the Superintendent's April 2, 1984 Order approving the Plan of Conversion, The One Bancorp transferred $5.837 million of these proceeds to Maine Savings Bank as additional capital.

On June 12, 1984, the Superintendent issued a certificate confirming that Maine Savings Bank had been legally converted in accordance with the laws of the State of Maine. No petition for judicial review of the Bureau of Banking's actions, orders and certificates described above has ever been filed under the provisions of Subchapter VI of the MAPA.

At the time of the conversion of Maine Savings Bank from mutual to stock form, Plaintiffs [4] each held passbook accounts and checking accounts at Maine Savings Bank. The passbook in force for Plaintiffs at the time of the conversion contained the following description of a mutual savings bank:

> This bank is a Mutual Savings Bank, founded for the purpose of encouraging thrift and the habit of saving. Mutual Savings Banks have no stockholders but are managed for the benefit of their depositors. After deducting the necessary expenses of conducting the business, all profits go to the benefit of the depositors as interest or in a reserve fund for their greater security.

Despite this legend, before the conversion neither Ann Lovell nor Plaintiff Campbell expected to receive anything more from their accounts than the balance plus accrued interest. Lovell's and Campbell's accounts were also held as of August 31, 1983, making them "eligible account holders" of Maine Savings Bank for purposes of buying stock under the Plan of Conversion. In this action, Plaintiffs seek to be certified as representatives of the class of virtually all such "eligible account

holders," of which there were approximately 89,000.

The consolidated amended complaint (Docket No. 59) alleges that the Plan of Conversion, the process by which it was approved, and the Maine statutes and regulations that authorized it violated numerous state and federal constitutional provisions and state statutory provisions. The consolidated amended complaint sought a court order nullifying the conversion, or in the alternative, a judgment awarding compensatory damages of $150 million and punitive damages of $50 million. Since the filing of the complaint, Maine Savings Bank has failed and the FDIC has been named its receiver. Plaintiffs, therefore, no longer seek nullification of Maine Savings Bank's conversion. Plaintiffs have also withdrawn their claims, set forth in Counts III and IX that the presumptive voting statute set forth in 9–B M.R.S.A. § 344(3) is unconstitutional and that the conversion plan violates Maine's conversion statute.

In their motions for summary judgment, Defendants contend, among other things, that the Certificate of Conversion issued by the Superintendent, and the expiration of the time limits for judicial review under 5 M.R.S.A. § 11002, separately or in combination, bar Plaintiffs' claims for relief based on state procedural law and state common law.

Plaintiffs contend, among other things, that under Maine law the account holders of Maine Savings Bank had a right to distribution of the accumulated surplus of Maine Savings Bank that vested upon its conversion to stock form. On the basis of such a right, Plaintiffs contend that the Maine Bureau of Banking's approval of Maine Savings Bank's Plan of Conversion, a plan which did not provide for a distribution of accumulated surplus to account holders, effected a taking or deprivation of account holders' property without due process or just compensation, in violation of their constitutional rights, for which the bank, The One Bancorp, and certain of its trustees and officers are answera-

---

**4.** Plaintiff Ann Lovell brings suit both individually and as the personal representative of the Estate of John Lovell, Sr. (her late husband). Mr. Lovell and she held a passbook savings account at Maine Savings at the time of conversion, and Mr. Lovell had the checking account. Mr. Lovell also held certificates of deposit in IRA accounts at the bank.

ble in damages. Plaintiffs' assertion of what they call their ownership interest in the bank also underlies their state law claims for breach of fiduciary duties, fraudulent and negligent misrepresentation, conversion, unjust enrichment, and breach of contract.

Given these claims by both sides, the Court certified the following three questions to the Law Court:

1. Does (1) the Certificate of Conversion issued by the Maine Superintendent of Banking on June 7, 1984, or (2) the time limits for obtaining judicial review of final agency action under the Maine Administrative Procedure Act, 5 M.R.S.A. § 11002, or (3) both in combination, bar Plaintiffs' claims for relief asserted under Maine common law and under the Maine Administrative Procedure Act, the Maine Banking Code (9–B M.R.S.A. §§ 343, 344) and the Maine Corporation Code (13–A M.R.S.A. § 608(1)(a)?

2. Does Maine law grant to depositors in a mutual savings association a right to vote by mail or proxy on the association's conversion to stock ownership?

3. Under Maine law, do depositors of a mutual savings bank have the enforceable right to a distribution of the surplus of any bank when it converts to stock form pursuant to 9–B M.R.S.A. § 344, in the absence of a charter provision providing any more than that set forth in Chapter 328, P. & S.L. of 1859 (the charter of Maine Savings Bank's predecessor, the Portland Five Cent Savings Institution)?

The Law Court answered the certified questions as follows:

1. Plaintiffs' claims for relief asserted under Maine common law are barred by the certificate of conversion issued by the Superintendent of Banking on June 7, 1984 and the time limits for obtaining Judicial review of final agency action, 5 M.R.S.A. § 11002. We decline to answer question 1

as it relates to plaintiffs' claims asserted under Maine statutory law.

2. We decline to answer question 2.

3. In the absence of a charter provision providing any more than that set forth in chapter 328 of P. & S.L. of 1859, depositors in a mutual savings bank do not have the enforceable right to a distribution of the surplus of any bank when it converts to stock form pursuant to 9–B M.R.S.A. § 344.[5]

*Lovell v. One Bancorp*, 614 A.2d at 67.

## I. Count I

### A. *Takings Clause*

 The Takings Clause of the Fifth Amendment of the United States Constitution, applied to the states through the Fourteenth Amendment, prohibits the taking of private property for public use without just compensation. *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 160, 101 S.Ct. 446, 450, 66 L.Ed.2d 358 (1980); *Hoffman v. City of Warwick*, 909 F.2d 608, 615 (1st Cir.1990). In Count I of the complaint Plaintiffs allege that the conversion of Maine Savings Bank from mutual to stock form without compensation to account holders constitutes a taking of property in violation of the Takings Clause.[6] The property Plaintiffs allege has been taken is their right as owners of the bank to a distribution of its net worth at the time of its dissolution or cessation to function.

The Supreme Court has explained that property interests are not created by the Constitution, but "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). This Court certified Question 3 to the Maine Law Court for a determination under state law of

---

**5.** As previously mentioned, the Court also declined to answer two other questions certified by this Court for response if the answer to Question 1 had been "No" and the answer to Question 2 or 3 had been "Yes."

**6.** The complaint also alleges a violation of the Takings Clause of the Maine Constitution. Since

analysis of Takings Clause claims is the same whether brought under the Maine or United States Constitution, *Bell v. Town of Wells*, 557 A.2d 168, 177 (Me.1989), the conclusion reached in the text applies also for Plaintiffs' claim under the Maine Constitution.

the nature and dimensions of the property interest held upon conversion by Plaintiffs in the surplus of Maine Savings Bank. The Law Court was presented with all the various bases of Plaintiff's claim to a property right in the bank's surplus which Plaintiff asserts here, specifically, the bank's charter, the Banking Code, the passbooks, Maine Savings's admissions to the Internal Revenue Service and basic contract principles. *See* Brief of the Plaintiffs, Ann Lovell, *et al.*, Concerning Questions Certified by the United States District Court for the District of Maine, at 7–17. The Law Court concluded that depositors in a mutual savings bank do not have the enforceable right to a distribution of the surplus of any bank when it converts to stock form pursuant to 9–B M.R.S.A. § 344. *Lovell,* 614 A.2d at 67.

The Law Court found specifically that although the Maine Banking Code provisions dealing with conversions require equitable treatment of depositors' interest in the bank's net worth at conversion, "nothing in the language of the conversion statute or in the underlying legislative history ... would indicate that a distribution of surplus to the depositors of a mutual savings bank is required on its conversion to stock form." *Id.* at 65. The Court also found that no property rights arise from the bank's charter: "If any right to solvent distribution existed in the [bank's] charter, it was taken away [by the Legislature] in 1923, and further, to the extent that the charter is in any way at odds with the Banking Code, the Banking Code controls, pursuant to 9–B M.R.S.A. § 511." *Id.* at 66. Finally, the Law Court addressed the concept of ownership in the mutual savings context:

> Significant characteristics of ownership are missing in the mutual context. The depositors in a mutual institution have no legal title to the surplus of the institution and do not share in any risk of the loss since their deposits are insured. The only "vested" interest a depositor has in the mutual institution is in the depositor's funds on account. These rights or interest remain unchanged in a conversion.... A depositor's interest in a pro rata distribution of the bank's surplus is a mere contingency and cannot be realized unless the bank

liquidates while solvent; an unlikely event. Plaintiffs are not entitled to receive cash or free stock for an interest that "hardly rises to the level of an expectancy." *Society for Savings v. Bowers,* 349 U.S. 143 [75 S.Ct. 607, 99 L.Ed. 950] (1955).

*Id.* at 67 (citation omitted). The Court also made clear that under the Maine Banking Code a conversion is not the equivalent of a solvent liquidation, the event which Plaintiffs claim would trigger the distribution which they seek. *Id.*

In *Board of Regents v. Roth* the Supreme Court described the attributes of the property "interests" subject to such constitutional protection: "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Board of Regents v. Roth,* 408 U.S. at 577, 92 S.Ct. at 2709; *Lowe v. Scott,* 959 F.2d 323, 334 (1st Cir. 1992). Similarly, in *Dames & Moore v. Regan,* 453 U.S. 654, 674 n. 6, 101 S.Ct. 2972, 2983 n. 6, 69 L.Ed.2d 918 (1981), the Supreme Court found that an interest that was "revocable, contingent, and in every sense subordinate to the President's power under the IEEPA [International Emergency Economic Powers Act]" would not support a constitutional claim for compensation.

In this case the Law Court has made plain that Plaintiffs did not have an enforceable right to the distribution of the surplus of Maine Savings either before or after its conversion from mutual to stock form under 9–B M.R.S.A. § 944. *Lovell,* 614 A.2d at 64–67. Plaintiffs, therefore, do not have a legitimate entitlement under state law to the interest which they now seek to protect. *See Roth v. Board of Regents,* 408 U.S. at 577, 92 S.Ct. at 2709. Moreover, the interests of Plaintiffs in the net worth of the surplus, as described by the Maine Law Court, *id.* at 66–67, were indeed contingent and the contingency was such a remote possibility that it did not rise to the level of an expectancy. Interests such as these will not support a claim under the Constitution for compensation. *Dames & Moore v. Regan,* 453 U.S. at 674 n. 6, 101

S.Ct. at 2983 n. 6; *see also, Chongris v. Board of Appeals,* 811 F.2d 36, 43–44 (1st Cir.1987). Summary judgment is in order for Defendants, therefore, on Plaintiffs' Takings Clause claim.[7]

■ Even if Plaintiffs' interests in the bank prior to conversion could have been considered property properly protectible under the Constitution, it is plain that the conversion, effected in accordance with Maine's conversion statute and with the approval of Maine's Superintendent of Banking, did not constitute a taking requiring compensation under the Constitution. As the Court of Appeals has noted, the Supreme Court has found three factors particularly significant in determining whether government regulation of property constitutes a taking: " '(1) the economic impact of the [statute] on the claimant; (2) the extent to which the [statute] has interfered with distinct investment-backed expectations; and (3) the character of the governmental action.' " *Hoffman,* 909 F.2d at 617 (*quoting Bowen v. Gilliard,* 483 U.S.

587, 606, 107 S.Ct. 3008, 3019, 97 L.Ed.2d 485 (1987)).

Maine's conversion statute had no appreciable economic impact on Plaintiffs. Before the conversion Plaintiffs had a right to their funds deposited on account and the interest accrued on those funds. They had exactly the same right after the conversion. Plaintiffs' funds were not at risk, and they testified that they expected only to receive their deposits and interest. Moreover, although Plaintiffs allege that they had a right to a distribution of the bank's profits in the event of a solvent liquidation, the possibility of a solvent liquidation prior to the conversion was unlikely. *Lovell,* 614 A.2d at 67. The record, therefore, also demonstrates that the conversion statute worked no interference with investment-backed expectations.

■ Finally, the conversion is not the type of government action which either physically invades Plaintiffs' alleged property or appropriates it for the State.[8] *See Hoffman,* 909 F.2d at 618 (*quoting Connolly v. Pension*

7. Plaintiffs argue that the Law Court's determination of the issue is not dispositive because only federal courts may determine whether an interest is "property" for federal constitutional purposes. Here, the Law Court has explained the nature of Plaintiffs' interest. In one or two instances the Law Court used language that indicated it was addressing issues of adequate compensation. For example, it stated that the depositors' contingent claims to the surplus were adequately protected and preserved by the liquidation account. *Lovell,* 614 A.2d at 67. This Court, however, has not relied on those conclusions of the Law Court in its analysis. Rather, it has compared the property interest as defined by the Law Court with the interests defined by the federal courts as meriting constitutional protection and found it wanting.

Plaintiffs argue that their interest here is like that found to be constitutionally protected property in *Webb's Fabulous Pharmacies,* 449 U.S. at 161, 101 S.Ct. at 450. In that case the Supreme Court held that Plaintiffs had a protectible interest in the interest on an interpleader fund held by the Court when the fund was held for the ultimate benefit of Plaintiffs. In that case, however, although the right to the interest was not a right to present distribution, the Court found that the right was fixed by state law and that state law gave Plaintiffs a clear entitlement to the interest which would eventually ripen. As the Court stated: "Eventually, and inevitably, that fund, less proper charges authorized by the court, would be distributed among the creditors as their

claims were recognized by the courts." *Id.* at 161, 101 S.Ct. at 451. Plaintiffs' claim to the distribution of the surplus here was highly unlikely ever to ripen because a solvent liquidation was so unlikely. From the outset, there was nothing eventual and inevitable about Plaintiffs' expectation of recovery given Maine's law and the nature of the interest.

8. Plaintiffs argue that the conversion statute has effected a "physical appropriation" of their property, presumably because the net worth of Maine Savings was transferred to The One Bancorp upon conversion rather than being paid to them. If Plaintiffs could ever have expected a distribution of the net worth of Maine Savings, it would only have been at the time of a solvent liquidation of the bank. The account holders at Maine Savings, including Plaintiffs, and their accounts were at all times subject to the laws of Maine, and the Law Court has explained that under the Maine Banking Code a conversion is not a solvent liquidation. *Lovell,* 614 A.2d at 67. As noted by the Law Court, other courts have reached the same conclusion. *Id.* (*citing In re East New York Sav. Bank Depositors Litigation,* 145 Misc.2d 620, 547 N.Y.S.2d 497, 500 (Sup.Ct. 1989), *Goldberg v. Philadelphia Sav. Fund Society,* No. 5289 (Pa.Ct.Comm.Pl., Aug. 10, 1983). Since Plaintiffs' deposits were still available to them and nothing had happened, or was likely to happen, to put them in constructive possession of the net worth of the bank, there has not been a physical appropriation of their property.

*Benefit Guaranty Corp.,* 475 U.S. 211, 225, 106 S.Ct. 1018, 1026, 89 L.Ed.2d 166 (1986)). Rather, it is an exercise of the police power in the banking arena. "Protecting the public through extensive bank regulation is a traditional function of the government." *Lovell v. Peoples Heritage Savings Bank,* 776 F.Supp. 578, 588 (D.Me.1991); *Craughwell v. Mousam River Trust Co.,* 113 Me. 531, 534, 95 A. 221 (1915). As the Supreme Court has stated, statutory actions which "adjust[s] the benefits and burdens of economic life to promote the common good" do not constitute takings requiring government compensation. *Connolly v. Pension Benefit Guaranty Corp.* 475 U.S. at 225, 106 S.Ct. at 1026.

### B. *Contract Clause*

Count I also contains a claim that the conversion statute and the Superintendent's order approving the conversion plan impaired an obligation of contract in violation of the Article I, § 10 of the United States Constitution and Article I, § 11 of the Maine Constitution, the Contract Clauses of each. Specifically, Plaintiffs allege that as owners of the mutual savings bank they had a contractual right to a pro-rata distribution of its surplus and that the conversion impaired that right.

■ In *Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978), the Supreme Court noted that the Contract Clause imposes some limits on a State's power to abridge existing contractual relationships, even in the exercise of its otherwise legitimate police powers. *Id.* at 242, 98 S.Ct. at 2721. The first question in evaluating a Contract Clause challenge to state action, however, is

> whether the state law has, in fact, operated as a substantial impairment of a contractual relationship. Minimal alteration of contractual obligations may end the inquiry at its first stage. Severe impairment, on the other hand, will push the inquiry to a

careful examination of the nature and purpose of the state legislation.

*Id.* at 244–45, 98 S.Ct. at 2722–23. As the Supreme Court has more recently explained, "[t]his inquiry has three components: whether there is a contractual relationship, whether a change in law impairs the contractual relationship, and whether the impairment is substantial." *General Motors Corp. v. Romein,* —— U.S. ——, ——, 112 S.Ct. 1105, 1109, 117 L.Ed.2d 328, 337 (1992).

■ There is no evidence in the record of any express contract between Plaintiffs and Maine Savings providing that Plaintiffs have an interest in the net worth of the bank. Plaintiffs argue, however, without much elaboration, that there is certainly an interference with Plaintiffs' charter rights and the reasonable expectations of MSB's owners. The Law Court determined, however, that Plaintiffs as depositors did not have enforceable rights to a distribution of the surplus of Maine Savings based on the charter. The Maine Banking Code rather than the bank's charter controls the subject of depositors' rights on conversion, and the Code provides no solace for Plaintiffs. Beginning in 1923 and continuing until the present, Maine law "eliminated any vested rights to distributions during the solvency of the bank, making dividends and interest a purely discretionary decision by the board of directors." *Lovell,* 614 A.2d at 63–67.[9] Thus, even if Plaintiffs had been termed "owners" of the bank in the charter, the nature of their ownership interest does not give them a contractual right to the surplus of the bank.

■ Plaintiffs also had no reasonable expectations based on their relationship with the bank concerning the bank's surplus. In Contract Clause analysis one significant consideration in determining the extent of any possible impairment of contract is whether Plaintiff has "purchased into an enterprise already regulated in the particular to which he now objects." *Veix v. Sixth Ward Bldg. & Loan Ass'n,* 310 U.S. 32, 38, 60 S.Ct. 792,

---

9. The Court recognizes that "[t]he question whether a contract was made is a federal question for purposes of Contract Clause analysis." *General Motors Corp. v. Romein,* —— U.S. at ——, 112 S.Ct. at 1110, 117 L.Ed.2d at 337. The Law

Court's analysis in *Lovell* of Plaintiffs' property interests and the relationship of the Code to the bank's charter and depositors rights more generally forms the foundation for this Court's independent assessment that no contract exists.

795, 84 L.Ed. 1061 (1940); *Lovell v. Peoples Heritage,* 776 F.Supp. at 592 (D.Me.1991). As this Court stated in *Lovell v. Peoples Heritage,* in a slightly different context,

> If there exist[ed] a charter-based contractual right ..., that right was rooted in the power of the legislature, which granted the charter. As the Law Court made clear in *Craughwell,* "the state has *ever* found it expedient" to closely regulate the banks to protect the public. Thus, even if the contract right existed, it is impaired only in the most minimal sense by the newly enacted statute because depositors had no reasonable expectation that the state would not change the rules governing banks and the way in which they might change form of ownership.

*Id.* (discussing Legislature's right to alter voting procedures); *see also Veix,* 310 U.S. at 38, 60 S.Ct. at 794 (recognizing the police power to alter the deposit contract). Since Plaintiffs have shown neither a contractual right nor that the conversion statute would work a significant impairment of any contractual right if it existed, the Court finds that there is no basis for Plaintiffs' Contract Clause claim.[10]

### C. *Substantive Due Process*

The Constitution also provides protection against arbitrary and irrational governmental action. *Hoffman,* 909 F.2d at 618. The complaint and Plaintiffs' brief suggest that Plaintiffs' right to this substantive due process, protected both by the United States and the Maine Constitutions, was violated by the conversion. To establish a substantive due process claim, Plaintiffs must show that the conversion statute is "arbitrary, discriminatory, or demonstrably irrelevant to the policy the legislature is free to adopt." *Pennell v. City of San Jose,* 485 U.S. 1, 11, 108 S.Ct. 849, 857, 99 L.Ed.2d 1 (1988). The Court must examine, therefore, whether any reasonably conceivable set of facts could establish a rational relationship between the conversion statute and the legitimate purposes of the State of Maine. *Tenoco Oil Co. v. Dept. of Consumer Affairs,* 876 F.2d 1013, 1021 (1st Cir.1989).

The statute and its legislative history show that the Legislature, in permitting conversions, was concerned with the raising of capital for banks while maintaining the safety, soundness, and capital adequacy of converting institutions. 9-B M.R.S.A. § 253(2)(B)(G); Report of the Governor's Banking Study Advisory Committee, 4–5, 19 (1974). The maintenance of a sound banking industry has long been a legitimate goal of state government. *See, e.g., Craughwell,* 113 Me. at 534, 95 A. 221. The record demonstrates that Maine's Superintendent of Banking believed a conversion which resulted in the distribution of stock to depositors without charge would be counter to the purpose of raising capital. The Superintendent was also concerned that by providing a windfall to persons who happened to be depositors of a conversion bank at the time of conversion banks would induce large-scale movement of deposits to banks that might still convert, thus disrupting the financial system. In this belief he echoed the findings of the Federal Home Loan Bank Board, 39 Fed. Reg. 9142, 9144 (March 7, 1974), 12 C.F.R. § 563(b)(3)(a) (1983). There is, therefore, obviously a reasonable set of facts establishing a rational relationship between the conversion statute and Maine's legitimate regulatory ends in the banking field. *See Tenoco Oil Co. v. Dept. of Consumer Affairs,* 876 F.2d at 1021.[11] Since Plaintiffs cannot establish their Takings Clause, Contracts Clause or substantive due process claims, summary judgment must be granted for Defendants on Count I.

---

10. The courts of Maine follow the Contract Clause jurisprudence of the federal courts in interpreting the Contract Clause of the Maine Constitution. *Clark v. Rust Engineering Co.,* 595 A.2d 416, 419 (Me.1991). Therefore, given the conclusion reached in the text on Plaintiffs' federal Contract Clause claim, Plaintiffs must also lose on their state constitutional claim.

11. The Law Court has stated that the concepts of substantive and procedural due process are the same under the Maine and U.S. Constitutions. *See Penobscot Area Housing Development Corp. v. City of Brewer,* 434 A.2d 14, 24 n. 9 (Me.1981); *Mahaney v. State,* 610 A.2d 738, 742 n. 4 (Me. 1992). Accordingly, Plaintiffs' substantive due process claim under the Maine Constitution must fail.

424

## II. Count II

In Count II Plaintiffs allege that the deprivation of account holders' ownership interest in Maine Savings Bank violates the Equal Protection Clause of both the Maine and United States Constitutions. Specifically, they allege that although depositors of converting mutual savings banks are similarly situated to policy holders in mutual insurance companies, they are treated differently by the state's conversion laws. As Plaintiffs' counsel acknowledges, this Court addressed the identical argument on a motion for summary judgment in *Lovell v. Peoples Heritage* and found it without merit. *Lovell v. Peoples Heritage*, 776 F.Supp. at 588–91. Moreover, as the First Circuit has stated, " '[i]n applying the Equal Protection Clause to most forms of state action, we thus seek only the assurance that the classification at issue bears some fair relationship to a legitimate public purpose.' " *Pearson v. Fair*, 935 F.2d 401, 411 (1st Cir.1991) (*quoting Plyler v. Doe*, 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786 (1982)). The constitutional standard for analyzing an equal protection claim is identical to that rationality standard employed in substantive due process analysis. *Id.* at 411 n. 18. The Court has already determined that the conversion law as applied in this case has a rational basis. Thus, summary judgment is appropriate for Defendants on Count II.[12]

## III. Counts III and IX

Plaintiffs have waived the claims for relief set forth in Counts III and IX of the Complaint. Statement Regarding Plaintiffs' Claims, ¶ 3. (Docket No. 158). Summary judgment will be granted for Defendants on those Counts.

## IV. Counts IV, V, VI, VII, VIII and XIII

Plaintiffs seek damages under Maine law for breach of fiduciary duty, intentional and negligent misrepresentation, tortious conversion of property, unjust enrichment, and breach of contract. After certification of Question 1 by this Court, the Law Court stated:

> We instruct the District Court that the statutory and administrative scheme governing the conversion of a mutual savings bank to stock form has effectively displaced private rights of action relating to the conversion process. The issuance of the certificate of conversion and the failure to seek judicial review under the Administrative Procedure Act, therefore, serve to bar plaintiffs' common law claims for relief.

*Lovell*, 614 A.2d at 62. The Law Court's answer to the certified questions is dispositive on the state law claims alleged in Counts IV, V, VI, VII, VIII, and XIII.[13]

Even if the Law Court had not answered Question 1 as it did, Plaintiffs would

---

12. Analysis under the Equal Protection Clauses of both the Maine and United States Constitutions yields the same result. *See State v. Chapin*, 610 A.2d 259, 261 (Me.1992); *Blount v. Dept. of Educational and Cultural Services*, 551 A.2d 1377, 1385 (Me.1988). Plaintiffs, therefore, cannot establish their Equal Protection claim under the Maine Constitution.

13. Plaintiffs now argue that the state law claims are barred only if adequate notice was provided to render the Superintendent's order valid. Count XI specifically challenges the adequacy of the notice provided to Plaintiffs before the conversion under the Maine and U.S. Constitutions and under the MAPA. The displacement by Maine's statutory scheme of Plaintiffs' private common law rights of action relating to the conversion process occurred at the time the statutory scheme was enacted. Even if the notice given to Plaintiffs were found constitutionally inadequate, which it is not, *see infra* at 426, the claims would not have vitality, because a finding of invalidity of the Superintendent's order cannot

breathe life into claims that have been superseded by a new statutory scheme.

The Legislature plainly had the constitutional authority to enact the type of bank regulatory scheme at issue here even if its enactment serves to deprive Plaintiffs of some previously held causes of action under the common law. *See Duke Power Co. v. Carolina Environmental Study Group*, 438 U.S. 59, 88 n. 32, 98 S.Ct. 2620, 2638, n. 32, 57 L.Ed.2d 595 (1978) ("Our cases plainly establish that '[a] person has no property, no vested interest, in any rule of the common law.' "). Plaintiffs specifically point to their breach of fiduciary duty claim as a property right of which they have been deprived without due process of law. The Supreme Court noted in *United States v. Cherokee Nation*, 480 U.S. 700, 707, 107 S.Ct. 1487, 1491, 94 L.Ed.2d 704 (1987), that the principles of fiduciary duty do not create property rights where none would otherwise exist. As has been demonstrated above, Plaintiffs' have no preexisting property rights requiring constitutional protection.

also be barred from recovering damages on these counts because they have not suffered the alleged injury. This Court explained in its certification to the Law Court that each of the state law claims is predicated on Plaintiffs' assertion that they were injured because they were deprived of their ownership interest in the net worth of Maine Savings. *See e.g.,* Complaint, ¶ 106, Prayers in Counts IV, V, VI, ¶ 139, ¶ 143, ¶ 172. As the Law Court determined, Plaintiffs were not entitled to a distribution of the surplus of Maine Savings. Therefore, they cannot recover damages for failure to receive such a distribution. Summary judgment is in order for Defendants on Counts IV, V, VI, VII, VIII and XIII.

### Counts X, XI, XII

■ Counts X, XI and XII seek nullification of the conversion and declaratory relief under the Maine Banking Code, the Maine Administrative Procedure Act and the Maine Business Corporation Act for Defendants' alleged procedural violations in the conversion process. Specifically, Plaintiffs allege that the Superintendent failed to promulgate regulations, that he and the bank failed to provide adequate notice of the conversion, and that they failed to require a quorum for the account holders meeting. Although Certified Question 1 encompassed Counts X, XI, and XII as well as the common law counts, the Law Court declined to answer regarding these counts because Plaintiffs represented that they no longer sought nullification of the conversion order, given the demise of Maine Savings Bank. In this Court, however, Plaintiffs press their claims for declaratory relief on these counts.

■ The Court is satisfied that these claims are no longer justiciable because there no longer exists a case or controversy regarding them. In order for a dispute to be justiciable, a claimant must have standing, that is, she must " 'allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief.' " *Rumford Phar-*

*macy, Inc. v. City of East Providence,* 970 F.2d 996 (1st Cir.1992) (*quoting Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984)). This "personal interest that must exist at the commencement of the litigation ... must continue throughout its existence" or the case becomes moot. *United States Parole Comm'n v. Geraghty,* 445 U.S. 388, 397, 100 S.Ct. 1202, 1209, 63 L.Ed.2d 479 (1980).

Although it was initially alleged that Plaintiffs' injuries could be redressed by nullification of the conversion, Plaintiffs admitted before the Law Court that they no longer sought that relief. Plaintiffs, however, have not either alleged or suggested that another type of equitable relief could restore or protect any of their rights. Given the demise of Maine Savings, the converting institution, the Court cannot discern any way in which equitable relief could redress Plaintiffs' alleged rights. *See Rumford Pharmacy, Inc. v. City of East Providence,* 970 F.2d at 1001 (holding that in the absence of allegations or appearance that equitable relief could redress plaintiff's injuries, plaintiff has no standing to assert its claim for declaratory or injunctive relief). Since Plaintiffs' equitable claims are moot, the Court is without jurisdiction to address the claims for declaratory relief which they still pursue. *See id.*

The Law Court's opinion on the state law counts demonstrates that even if jurisdiction did exist, most of these claims,[14] as well as the state common law claims, are barred by the certificate of conversion and the Maine APA. Plaintiffs allege problems with the procedures employed in the conversion process. As the Law Court stated, such attacks on the propriety of the conversion procedure will not be entertained unless brought through the statutorily-prescribed channels:

It seems clear that the legislature intended section 256 to be the exclusive avenue for relief from the Superintendent's order of approval. It would certainly be anomalous to give the certificate of conversion conclusive effect absent judicial review of the Superintendent's action taken in accor-

---

**14.** The allegation that Plaintiffs were deprived of constitutional due process by deficient notice of the conversion is discussed *infra.*

dance with the APA, but then to allow common law causes of action attacking the contents of the plan of conversion and the conversion process in general.

*Lovell,* 614 A.2d at 62. The certificate of conversion is " 'conclusive evidence of the correctness of all proceedings' relating to the conversion," 9–B M.R.S.A. § 343(4)(B), and Plaintiffs failed to seek review of the Superintendent's decision as required by the Banking Code and the Maine APA. *See, Maines v. Secretary of State,* 493 A.2d 326, 328 (Me. 1983).

■ Count XI alleges that Plaintiffs' right to procedural due process guaranteed by the Fourteenth Amendment to the United States Constitution and Article I, Section 6–A of the Maine Constitution was violated by Defendants' failure to provide adequate notice of the conversion. Plaintiffs correctly recite the principles underlying the constitutional requirement of notice:

> We recently have observed that the concept of due process is equivalent to "fundamental fairness," and that "[n]otice and an opportunity to be heard have traditionally and consistently been held to be the essential requisites of procedural due process." ... We further elaborated in *Gorman:*
>
>> The hearing, to be fair in the due process sense, implies that the person affected was afforded the opportunity to respond, explain, and defend. Whether the hearing was fair depends upon the nature of the interest affected and all of the circumstances of the particular case.

*Newman v. Commonwealth,* 884 F.2d 19, 23 (1st Cir.1989) (*quoting Gorman v. University of Rhode Island,* 837 F.2d 7, 12 (1st Cir. 1988)).

Here it is plain that there was no constitutionally-cognizable property interest. *See supra,* at 421. Even if there were, Plaintiffs received published notice of the planned conversion early on in the process and individual notice of the conversion before the alleged deprivation occurred.[15] A packet of materials was sent to all account holders before the certificate of conversion was issued on June 7, 1984 and before the conversion was consummated on June 12, 1984. The packet included an accurate description of the conversion and its effects, informed them of the Superintendent's conditional approval of the conversion plan, and recited the time period for judicial review of the Superintendent's order.

Plaintiffs complain that the notice did not really inform them of the consequences of the conversion, but their complaint presumes that they were entitled to a distribution of the net worth of the bank, an assumption held unfounded by the Maine Law Court and by this Court. Plaintiffs are entitled to accurate, informative notice, not to their particular characterizations of the information being disseminated. *See Lessler v. Little,* 857 F.2d 866, 874–76 (1st Cir.1988) (discussing notice required under the federal securities laws). As discussed above, Plaintiffs received sufficient notice, given the minimal nature of the interest which they sought to protect. The Court finds no basis for Plaintiffs' procedural due process claim brought under the U.S. Constitution. Moreover, the Law Court "has adhered to the principle that the Maine Constitution and the United States Constitution are declarative of similar concepts of due process." *Mahaney v. State,* 610 A.2d at 742 n. 4 (Me.1992). Thus, even if jurisdiction were appropriate, Plaintiffs would be entitled to no relief on Count XI under the Maine Constitution either.

Accordingly, it is *ORDERED* that Defendants' Motions for Summary Judgment be, and they are hereby, *GRANTED.*[16]

SO ORDERED.

---

**15.** The Court of Appeals noted in *Hoffman* that when the state makes a class-wide policy determination, the Due Process Clause does not require it to afford a hearing to each affected individual. *Hoffman,* 909 F.2d at 620–21.

**16.** The Court has considered and rejected all the arguments made by Plaintiffs in their brief but not specifically discussed in the text.